**AMERICAN CIVIL LIBERTIES UNION OF OHIO, Plaintiff,**

v.

**Robert TAFT, Governor of the State of Ohio, Defendant.**

No. C2–02–766.

United States District Court, S.D. Ohio, Eastern Division.

Aug. 26, 2002.

Raymond V. Vasvari, Jr., ACLU of Ohio Foundation, Cleveland, OH, for Plaintiff.

Arthur J. Marziale, Jr., Ohio Atty General's Office, Columbus, OH, for Defendant.

## *ORDER*

SARGUS, District Judge.

This matter is before the Court for consideration of Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. (Doc. # 2). Plaintiff seeks from this Court an injunction requiring Defendant to issue a writ of election ordering a special election to fill a vacant seat in the United States House of Representatives. The vacancy in the Seventeenth District has occurred as a result of the expulsion from Congress of James Traficant, Jr. who was elected as the district's representative for a term extending from January 3, 2001 through January 2, 2003. Plaintiff asserts its claim under 42 U.S.C. § 1983 [1] alleging that the Governor has violated Article I, Section 2, Clause 4 of, and the Fourteenth Amendment to, the United States Constitution.

Defendant contends that (1) an injunction should not issue because Plaintiff lacks standing to sue; (2) the doctrine of laches bars Plaintiff's claims; and (3) the United States Constitution does not require Defendant to issue a writ of election before the end of the current congressional term.[2] The Court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331. For the reasons set forth below, Plaintiff's motion is **DENIED.**

### I.

The Seventeenth Ohio Congressional District, as presently constituted, includes all of Mahoning and Columbiana counties, and parts of Trumbull County, Ohio. *Complaint* # 8. Prior to July 24, 2002, the Seventeenth District was represented in the United States House of Representatives by James Traficant, Jr. *Id.* ¶ 9. On April 11, 2002, Traficant was convicted in federal court on ten counts of racketeering, bribery and fraud. *Plaintiff's Memorandum in Support of Motion for Temporary Restraining Order and for*

---

1. 42 U.S.C.1983 states in part:

   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

2. Defendant also claims that the Court lacks jurisdiction over Plaintiff's state law claims under *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Plaintiff has since conceded this point and no longer argues that this Court has jurisdiction over its state law claims. Transcript of Oral Argument, at 20.

*Preliminary Injunction,* at 3 (*"Plaintiff's Memorandum in Support"*). As a result of his conviction, and a related ethics inquiry, he was expelled from the House on July 24, 2002. *Complaint* ¶ 10. Traficant's term would otherwise have expired on January 3, 2003. *Complaint* ¶ 12.

Defendant, Governor Taft does not intend to call a special election to fill Traficant's seat. *Defendant's Memorandum Contra Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction,* Exs. 2, 3 (*"Defendant's Memorandum Contra"*). The Governor stated his position in an official news release issued July 25, 2002. *Id.* Ex. 3; *Plaintiff's Memorandum in Support,* Ex. D. According to Governor Taft, after consulting with local elected officials of the district, he determined that the expense of a special election was too great to justify a special election for a term which would be virtually impossible to fill prior to its expiration.

Plaintiff brings this cause of action requesting the Court to issue a preliminary injunction requiring Defendant to hold a special election to fill the vacancy created by the expulsion of Mr. Traficant. *Id.* ¶ 1. Plaintiff contends that, while the Governor has the authority to pick the date of the election, the special election may be held on the date of the regular election now set for November 5, 2002.

In the November 5, 2002 general election, Ohio voters will elect eighteen members to the House of Representatives instead of the current nineteen members. Following the 2000 census, Congressional seats were reapportioned and districts redrawn accordingly. *Defendant's Memorandum Contra,* Ex. 9. Thus, the Seventeenth District for which Traficant was a representative has been redistricted and the new Seventeenth District includes portions of Trumbull, Portage, Mahoning and Summit counties.

The House adjourned on July 26, 2002 and will return on September 4, 2002. The current House schedule runs through October 4, 2002, at which time it is presently scheduled to adjourn until the new Congress is seated on January 3, 2003.

## II.

### A. Standing

The doctrine of "associational" or "representational" standing permits organizations, in certain circumstances, to premise standing entirely on injuries suffered by their members. *Automobile Workers v. Brock,* 477 U.S. 274, 281–82, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Warth v. Seldin,* 422 U.S. 490, 511, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The test for associational standing is composed of three parts. The plaintiff association must show that:

1. At least one of its members possesses standing to sue in his or her own right;

2. The interests the suit seeks to vindicate are germane to the organization's purpose; and

3. Neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 552–54, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (explaining the trilogy of cases, *Brock, Hunt* and *Warth, supra,* from which the doctrine of associational standing emerged); *NAACP v. City of Parma, Ohio,* 263 F.3d 513, 524 (6th Cir. 2001).

**First,** the Court concludes that Plaintiff has met its burden under prong one of the associational standing test. Under this issue, Plaintiff must show that it has members in the Seventeenth District who would be able to bring this action in their own right. In other words, Plaintiff must show that it has at least one member who "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) and *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

Plaintiff has attached to its Reply Memorandum the Declarations of two of its members who reside in, and are registered voters in, the Seventeenth Congressional District of Ohio. *Plaintiff's Reply Memorandum,* Exs. B and C. Each declarant testifies that they are threatened with injury if not allowed to vote in a special election to fill Traficant's House seat. Further, it is evident that this threatened injury is fairly traced to the refusal of Defendant to call a special election. Finally, the threatened injury can be redressed by requiring Defendant to hold a special election.

**Second,** the Court concludes that Plaintiff has shown that the interests this suit seeks to vindicate are germane to the ACLU's mission. The ACLU's adopted mission statement provides:

The object of this organization is to aid in maintaining and extending constitutional and other fundamental rights, liberties, privileges, and immunities, and to take all legitimate actions in furtherance of that object without political partisanship.

*Plaintiff's Reply Memorandum,* Ex. A ¶¶ 6–8. This suit alleges violations of the constitutional rights to vote and to representation. Clearly, a suit brought under the auspices of securing the constitutional rights to vote and to representation is germane to Plaintiff's mission to aid in maintaining constitutional rights.

**In regard** to the third requirement for associational standing, the Court concludes that this too has been met by Plaintiff. There is nothing about this case that requires the participation of individual ACLU members. Defendant argues that Plaintiff has a conflict of interest in this case because some of their members would suffer injury because of the cost of a special election. *Defendant's Memorandum Contra,* at 12. This argument has been rejected by the Sixth Circuit in *Gillis v. U.S. Dept. of Health and Human Services,* 759 F.2d 565 (6th Cir.1985). In *Gillis,* the defendant pointed to potential conflicts between the plaintiff and its members. The defendant claimed that because the relief sought could have involved substantial costs to the plaintiff's members, the suit conflicted with the interests of the plaintiff members to whom these costs might be passed. The *Gillis* court explained that:

Although there is a theoretical conflict between [plaintiff] members posited by [defendant] it would not seem to be the type that should deprive an association of representational standing. First, the adverse effects to certain members of the relief being sought are both speculative and indirect. Second, once an organization has alleged actual injury to "its members, or any one of them," it may then argue on behalf of the

"public interest." Virtually any relief involving the expenditure of money that benefits some but not all of an organization's members potentially means that that money will be unavailable to or in part exacted from the remainder of the membership. By joining an organization dedicated to a particular goal in the public interest, members indicate a willingness to make certain sacrifices productive of that goal. Carried to its logical extreme, evaluation of representational standing in terms of the adverseness of remote interests of discrete members would seriously undermine the ability of individuals through organizations to achieve public interest objectives through the legal system.

759 F.2d at 572–73 (internal citations omitted).

Accordingly, the Court concludes that Plaintiff has associational standing to bring this suit on behalf of its member in the Seventeenth Congressional District of Ohio.

### B. Laches

■ "Laches is the 'negligent and unintentional failure to protect one's rights.'" *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 320 (6th Cir.2001) (quoting *Elvis Presley Enterprises, Inc. v. Elvisly Yours Inc.*, 936 F.2d 889, 894 (6th Cir.1991)). A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it. *Id.* at 320–21; *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 367 (6th Cir.1984)..

■ Traficant was expelled from the House on July 24, 2002. Eleven days later, on August 5, 2002, the ACLU filed this suit. *Defendant's Memorandum Contra*, at 13. Further, Defendant and Plaintiff jointly agreed, without contest, to the briefing schedule set forth by this Court. Thus, the Court concludes that Plaintiff was diligent in timely filing this case and that Defendant was in no way prejudiced by the timing of Plaintiff's filing.

### C. Special Election

The first Article of the Constitution creates a bicameral legislature, including the House and Senate. Section 2, Clause 4 of that Article states:

When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

U.S. Const. art. I, § 2, cl. 4. Section 4 further provides that:

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time by Law make or alter such Regulations, except as to the Places of chousing Senators.

U.S. Const. art. I, § 4, cl. 1.

Congress has also enacted by statute in Title 2, Section 8, of the United States Code, a provision that delegates to the states the discretion and authority to determine the time for holding such elections. The section provides:

Vacancies

The time for holding elections in any State, District, or Territory for a Representative or Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories respectively.

2 U.S.C. § 8

The Constitution from its inception has made a sharp distinction between vacan-

cies occurring in the United States Senate as opposed to vacancies occurring in the United States House of Representatives. *Compare* U.S. Const. art. I, § 2 *with* U.S. Const. art. I, § 3. Under the original Constitution, Senators were selected by state legislatures. When vacancies then arose, state legislatures would simply fill them. From the ratification of our Constitution to the present, however, no person could ever be appointed to the House of Representatives. Only through elections, either general or special, may a person be elected to the United States House of Representatives.[3]

In 1933 the Constitution was amended to provide that sessions of Congress shall begin on January 3rd of every even numbered year. U.S. Const. amend. XX. Over the intervening sixty eight years, thirty three sessions of Congress have been held. Twelve of these sessions included what are termed "holdover sessions," meaning votes and sessions occurring after a general election involving all

House seats, but before expiration of the existing terms on the following January 3rd. (*See* Doc. # 6 and attachments thereto).

■ The Ohio Constitution also empowers the Ohio General Assembly to determine the method of filling vacant offices, while recognizing that such provisions must be consistent with the United States Constitution. *See* Ohio Const. art. II, § 27 *and* Ohio Const. art. XVII, § 2. Ohio Revised Code section 3521.03[4] directs the governor of the state to issue a writ of special election to fill any vacant seat in the House of Representatives of the United States. The Court also notes, that Ohio Revised Code section 3513.32[5] requires special primaries if more than one candidate per party files nominating petitions for the unexpired congressional seat. In this case it is unknowable at this junction whether a special primary is necessary. If only one candidate from each party were to file, no special primary would be held. If more than one candidate from each par-

---

3. In 1913 the Constitution was amended to provide for direct election of United States Senators, and the amendment of the Constitution has provided that the states may, through their own legislature, authorize the governor to fill an interim for U.S. Senate. *See* U.S. Const. amend. XVII. No such language permits the filling of a vacancy in the House of Representatives.

4. Vacancy in office of congressman.

When a vacancy in the office of representative to congress occurs, the governor, upon satisfactory information thereof, shall issue a writ of election directing that a special election be held to fill such vacancy in the territory entitled to fill it on a day specified in the writ. Such writ shall be directed to the board of elections within such territory which shall give notice of the time and places of holding such election as provided in section 3501.03 of the Revised Code. Such election shall be held and conducted and returns thereof made as in case of a regular state election.

O.R.C. § 3521.03

5. Primaries for special elections.

When a special election is found necessary to fill a vacancy, the date of the primary election shall be fixed at the same time and in the same manner as that of the election, by the authority calling such special election. The primary election shall be held at least fifteen days prior to the time fixed for such special election. Declaration of candidacy and certificates for such primary shall be filed and fees shall be paid at least ten days before the date for holding such primary election.

A primary election preceding a special election to fill a vacancy in an office shall be eliminated if no valid declaration of candidacy is filed for such office, or if the number of persons filing such declarations of candidacy as candidates of one political party does not exceed the number of candidates which such political party is entitled to nominate for election to such office.

O.R.C. § 3513.32

ty files, then a special primary is required under Ohio law. A special primary could not be held on November 5, 2002, the date now established for the Ohio general election. A special election to nominate a party candidate for Congress would have to be held in September or October of 2002 and would involve only a primary ballot for a single official in a district set to disappear on January 3, 2003.

Further, there are a myriad of state law requirements involving any type of election, including special elections to Congress. There are notices to be given with regard to the date of the special election. O.R.C. § 3501.03. There are time periods preceding the election during which time people may apply for absentee ballots. O.R.C. §§ 3509.03, 3509.031, 3509.08, 3511.02. There are special post-election statutes requiring a ten day waiting period after elections before the counting of ballots to ensure that overseas ballots, particularly those case by members of the Armed Forces, may be received. O.R.C. § 3505.32. Finally, Ohio requires a five day period after the certification of election results in which a candidate may demand a recount. O.R.C. § 3515.02.

The parties do not dispute, however, that it is physically possible for a special primary and general election to be held from today's date or the date the vacancy originally occurred, prior to the expiration of this term of Congress. Consistent with Ohio law, a special election, including a special primary, could be held before November 5, 2002, and a candidate elected and certified as the winner by November 25, 2002, which is six weeks before the term expires. Consistent with Ohio law, a special primary and special general election cannot be completed before October 4, 2002, the date now established, although subject to change, for final adjournment of the House.

## III.

Few cases that have addressed the issue before the Court. Of the few which have, none come from the Supreme Court or the Sixth Circuit Court of Appeals.

The parties have focused on *Jackson v. Ogilvie,* 426 F.2d 1333 (7th Cir.1970) *cert denied,* 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 64 (1970), a decision from the Seventh Circuit Court of Appeals. *Ogilvie* involved a vacancy in Congress following the death of a member in August of 1969. At the time of the death, sixteen months remained on the term of office. The Governor of Illinois refused to order a special election. The district court refused to order the Governor of Illinois to order a special election. By the time the case was decided by the Court of Appeals, the length of the remaining term was approximately seven months. Nonetheless, the Court of Appeals ordered a special election in its May 6, 1970 opinion, while noting that the election could take place on the same day as the regularly scheduled November general election. Consequently, from May of 1970 through November of 1970 the seat remained vacant, a period of seven months during which Congress was presumably in session for a substantial portion of the period. The case makes no reference to special primary elections to be held on a day not otherwise scheduled by the State of Illinois for a regular election.

*Ogilvie* stands for the proposition that whatever discretion the governor may have in issuing a writ of election, the discretion is not without limits. The Court held that Article I, Section 2, of the Constitution requires a governor to hold a special election in a case involving a sixteen month remaining term of office.

By contrast, in *Mason v. Casey,* Civ.A. No. 91–5728, 1991 WL 185243 (E.D.Pa. Sept. 18, 1991), the Court held that the

Governor of Pennsylvania should not be compelled to issue a writ for a special election. *Mason* involved a vacancy that arose on September 11, 1991, in a Congressional district in Pennsylvania. The district court for the Eastern District of Pennsylvania found that the governor of the state had discretion to not order a special election to fill a vacancy which occurred on September 11, 1991, to occur on the same day as the regularly scheduled general election on November 5, 1991. The plaintiff contended that a delay in scheduling the election for November 5, 1991 would result in an unconstitutional denial of representation in the House of Representatives. Pennsylvania law, which the plaintiffs challenged as unconstitutional, required the Governor to give at least sixty days advanced notice of a special election, thereby preventing a special election on November 5, 1991. The district court refused to declare the Pennsylvania statute unconstitutional, even though such statute presumably prevented a special election until April 28, 1992.

The final case is a decision from the Supreme Court of Rhode Island from 1887. *In re Representative Vacancy,* 15 R.I. 621, 9 A. 222 (1887). In this case, the Governor of Rhode Island had requested from the Supreme Court an opinion as to whether a special election was required to be held to fill a vacant House seat. The Court stated:

> We think, therefore, that your excellency has power, under the provision above quoted, to issue a writ of election to fill the vacancy, and, having the power, we think it is for your excellency to decide whether, considering how soon the Forty-ninth congress will terminate, it is your duty to exercise it.

*Id.* at 223.

From these cases, the Court concludes that a governor has substantial discretion as to the timing of a special election. Further, if the unexpired term is of exceedingly short duration, the Governor has some discretion to forego a special election.

Plaintiff in this case urges the Court to adopt a standard that so long as a special election can be completed under state law before the term of a vacant House seat expires the Governor must issue a writ of election. Plaintiff asserts that the governor's obligation under the Constitution is mandatory in such circumstances. There is no factual dispute that it is physically possible for the state to conduct such an election between now and January 3rd and to certify the candidate.

Plaintiff's position overlooks the fact that, as of this date, the House is officially scheduled to adjourn on October 3, 2002. Under Ohio election law, there is not sufficient time in which to hold a special primary and general election prior to the date of adjournment. While the House may extend such date of final adjournment, and the President could conceivably call a special session of Congress, neither of such potentialities have occurred. Finally, given the discretion exercizable by the Governor, the Court finds no abuse of such authority.

The Court also is mindful that the framers of the Constitution had to have contemplated that, by requiring special elections to fill House vacancies, seats would necessarily be unfilled for certain periods of time. In 1787, given the state of communication and transportation, elections could not be organized, advertized, and held in a short period of time. While advances in technology and communications may shorten the time necessary to hold a special election, the Governor has an array of legitimate state interests to consider as to the calling of a state run special election.

In *Valenti v. Rockefeller*, 292 F.Supp. 851, 859, 860 (W.D.N.Y.1968), *aff'd* 393 U.S. 405, 89 S.Ct. 689, 21 L.Ed.2d 635 (1969), a three judge panel recognized the interest of the state of New York in foregoing an immediate special election for U.S. Senate and instead deferring the vote until a regularly scheduled election more than two years later. The Court noted that voter interest and turnout are much higher when a variety of offices are on the ballot. Political parties are more apt to organize and stimulate local interest when voters are asked to chose a number of officeholders, as opposed to a single position. Further, if a special election is held for a single office with only short advance notification, voter awareness of either of the candidates or issues is significantly diminished. In addition, special elections held only for a single office with an extremely short term remaining would predictably result in highly diminished voter turnout.

The Governor may also consider whether sufficient time is available to hold a special election for which all necessary and appropriate information and safeguards are provided. Ohio law properly requires sufficient time to print and mail absentee ballots which correctly identify all candidates; the same law requires local election boards to wait a certain number of days for absentee ballots to be returned. Further, polling places available for general elections may not be available for special elections; changing traditional voter locations can add confusion, or worse, unintended voter disenfranchisement. The Governor may consider that extra time may be needed to advertise new locations of balloting. In addition, poll workers, who are generally employed by the day, may not be available for a special election. A breakdown in any of these areas, as well as others, could result in an election lacking reliability. The less time to organize a special election, the greater the risk of a flawed election.

All of these are legitimate state concerns in determining the timing and necessity of a special election. The Court also notes that Ohio law does not require or even permit special elections for offices other than the U.S. House of Representative. See e.g.s. O.R.C. § 305.02 (county commissioners); O.R.C. § 733.08 (mayors); O.R.C. § 731.43 (council members). While Ohio law cannot, of course, impair a mandate of the U.S. Constitution, its Governor may consider those concerns as he exercises the discretion given him as to the calling of a special election. County Boards of Elections, which have the duty to run special elections, have extremely limited experience in such elections, since such elections are exceedingly rare in Ohio involving only vacant House seats. This fact means that more time is required to insure the integrity of the electoral process.

The Court notes that it has not considered the issue of expense in reaching its conclusion. The fact that a special election involves substantial cost could not, in and of itself, excuse compliance with a constitutional mandate. The Governor, although mentioning cost, has also expressed concern as to the potential problems of a hastily arranged special election.

A final factor the Court considers is whether the Governor abused his discretion by refusing to schedule an election for potentially illicit purposes such as partisan advantage. Here, the Governor was asked by the County Commissioners of all three counties in the Seventeenth District not to schedule a special election. Further, the Chairs of both state political parties have also agreed that a special election is unnecessary. These considerations are valid only to the analysis of whether partisan

motives might have influenced the Governor's decision, which clearly they did not.

Under the circumstances of this case, this Court concludes that the Governor did not abuse his discretion in refusing to issue a writ of election. Based upon the foregoing, it is the Court's determination that Plaintiff's request for a temporary restraining order and preliminary injunction is DENIED.

## IV. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED**. The Clerk is **DIRECTED** to **DISMISS** this case.

**IT IS SO ORDERED.**