In re Francis E. BARKER, Debtor.

Diane Dellamarggio, Executrix for Francis E. Barker, Deceased, Movant,

v.

B–Line, LLC, a Washington Limited Liability Company, Respondent.

No. 01–33960–C–7.

United States Bankruptcy Court, E.D. California.

Feb. 25, 2004.

2. Page Seven of the Status Report reveals Plaintiff's knowledge of the stay.

Lawrence M. Kahn, Weinstein, Treiger & Riley, P.S., Seattle, WA, attorneys for B–Line, LLC.

Diane Dellamarggio, Vacaville, CA, pro se.

## OPINION

CHRISTOPHER M. KLEIN,
Bankruptcy Judge.

B–Line, LLC ("B–Line"), respondent in this reconsideration of claim proceeding under 11 U.S.C. § 502(j), is in the business of purchasing "charged-off bankruptcy accounts and related deficiency balances"

from consumer finance companies on the theory they may eventually be paid. The questions presented revolve around the rights and obligations of an assignee of a claim when there is a dispute regarding the amount owed. The opinion is published because the business of selling charged-off bankruptcy accounts is growing and has been little litigated.

Revised Article 9 of the Uniform Commercial Code, which applies to assigned consumer accounts, prescribes the law for resolving disputes over amounts owed on assigned accounts and exposes the assignee to counterclaims.

Requirements of due process were satisfied in this case when the claim objection was mailed, in accordance with Federal Rule of Bankruptcy Procedure 2002(g), to the address specified in the proof of claim filed by B–Line's assignor. As assignee, B–Line chose to forgo the protections of the transfer-of-claim procedure under Federal Rule of Bankruptcy Procedure 3001(e) and will not be heard to complain of self-inflicted consequences.

Finally, B–Line's contractual "put back" procedure for returning disputed accounts to its assignor does not mean that no assignment occurred. Rather, at least until the assignor accepts a re-assignment, B–Line must endure the dispute with the account debtor and can obtain a remedy against its assignor.

### Facts

Francis Barker filed this bankruptcy case on December 6, 2001, and died on August 2, 2002. Movant Diane Dellamarggio is his daughter and the executrix of his decedent's estate.

The Barker bankruptcy estate is a so-called surplus estate in which funds will be distributed to the debtor's decedent's estate pursuant to 28 U.S.C. § 726(a)(6) after paying all creditors in full with interest.

Conseco Finance Servicing Corporation, formerly Green Tree, ("Conseco") was scheduled as a creditor with respect to a debt originally secured by a motor home that had been repossessed and sold before bankruptcy.

Conseco filed Proof of Claim No. 3, dated February 27, 2002, on account no. 14727999 seeking $19,413.01 as an unsecured deficiency balance, and specifying that notices should be sent to: "Dana Erickson F617, Conseco Finance, 332 Minnesota Street Suite 610, St. Paul, MN. 55101, 1–800–322–3323, Ext. 86190."

Attached to the proof of claim was the first page of the purchase contract for the vehicle. The contract specified that the buyer was Ruby Peters and the co-buyer was Francis Barker and that the use of the vehicle was "personal, family, or household."

Conseco sold account no. 14727999 to B–Line, a Washington limited liability company, in July 2002, but B–Line did not file evidence of the transfer as provided by Federal Rule of Bankruptcy Procedure 3001(e)(2).

The "Purchase Agreement" between Conseco and B–Line proffered by B–Line as proof to the transaction covering account no. 14727999 was executed July 5, 2002, with a "Cut-off Date" of May 31, 2002, and a "Closing Date" of June 30, 2002.

B–Line introduced a redacted copy of the agreement into evidence, deleting approximately two-thirds of the agreement on the premise of "trade secrets." The agreement was admitted into evidence with the express understanding (reiterated by B–Line's counsel several times on the record) that nothing that was omitted could possibly affect the outcome of the

dispute before the court and that B–Line was knowingly bearing all risk of having omitted to place a material term in evidence.

The Purchase Agreement provided for sale of "charged-off bankruptcy accounts and related deficiency balances which are delinquent, but the outstanding balance of which remains the obligation of the defaulting customer."

In the agreement, B–Line appointed the law firm of Weinstein, Treiger & Riley as its attorney-in-fact.

The Purchase Agreement provided in section 6 that "Seller [Conseco] warrants and represents: ... (g) none of the Purchased Accounts are subject to a suit, action, or proceeding before any court, administrative agency or arbitrator based upon a condition existing on or before the Purchase Date other than the bankruptcy proceedings of each Purchased Account's obligor." [1]

On August 20, 2002, (eighteen days after the debtor died) the chapter 7 trustee distributed to Conseco $19,701.62, consisting of the full $19,413.01 asserted on its proof of claim on account no. 14727999, together with $288.61 representing interest at the legal rate from the date of the filing of the petition as required by 11 U.S.C. § 726(a)(5). The sum of $3,747.92 was also distributed to the debtor as a surplus pursuant to 11 U.S.C. § 726(a)(6).

When the decedent's executrix compared her father's records to the proofs of claim, she concluded that several were objectionable, one which was the Conseco claim that she believed had been overpaid by approximately $7,000.00.

The executrix filed an Objection to Trustee's Report of Final Account and Request for Closing and Discharge of Trustee, which came before the court on December 11, 2002.

In light of the confused situation resulting, in part, from the fact that the executrix was appearing pro se without knowing basic bankruptcy law and procedure, and since it arguably called into question the performance of a chapter 7 trustee appointed and policed by the United States trustee, the staff of the United States trustee volunteered to help clear up the situation. The proceeding was continued for a period calculated to permit that process to occur.

The United States trustee's staff attorney filed an affidavit on January 22, 2003, reporting that on December 12, 2002, he had telephoned Conseco at the number on the proof of claim and been told by Conseco that the Barker account had been sold to B–Line on October 21, 2002.[2] He further reported that he had, also on Decem-

---

**1.** Section 4 of the Purchase Agreement provided:

> Except in the case of a breach of a representation (in Section 6) by Seller, there will be no reimbursement for Purchased Accounts. This sale is considered "as is". The purchaser acknowledges that Seller does not represent the collectability of this portfolio.

**2.** B–Line's chief financial officer testified by declaration (admitted in evidence): "On or about October 18, 2002, pursuant to a purchase agreement (the 'Purchase Agreement'), B–Line, LLC ('B–Line') acquired a large portfolio of receivables from Conseco Finance Servicing Corporation ('Conseco').... At the time of purchase, Conseco represented to B–Line that the balance on Account No. 14727999, Francis E. Barker was $1,125.22."

There is no explanation how a transfer under the purchase agreement in evidence could have occurred in October 2002, when the agreement specified a cut-off date of May 31, 2002, and a closing date of June 30, 2002. If there is an explanation in that agreement, it would be in the part redacted as a trade secret—hence, B–Line has waived its right to rely on it.

ber 12, 2002, spoken with Sarah Garcia of Weinstein, Treiger & Riley, who said she would obtain the Barker Conseco file and return his call. As of January 22, 2003, she had not called back and had not responded to follow-up calls made on January 16 and 21, 2003.

This court entered a memorandum decision on the objection on February 5, 2003, in which it deferred action on the objection. It ruled that the circumstances were such that the allowance and payment of the claim could be reconsidered pursuant to § 502(j) and Federal Rule of Bankruptcy Procedure 3008 and that the debtor's executrix had standing because it was a surplus estate under § 726(a)(6). As the trustee abstained because only the executrix could benefit, the ruling informed her that, if she wished to persist, she must bring the appropriate proceeding.

The executrix attempted unsuccessfully to obtain information from Conseco and B–Line. Conseco told her to contact B–Line. When she did so, B–Line's John Clark ("Portfolio Administrator for B–Line, LLC") told her orally and in writing that B–Line's records reflected that Conseco represented to B–Line in October 2002 that the Francis Barker account no. 14727999 had a deficiency balance of $1,125.22 still owing.[3] B–Line later represented to her that B–Line did not own the account because it had been "put back" to Conseco as a controverted account that had been assigned in breach of Conseco's contractual warranty that none of the assigned accounts were in controversy. When she went back to Conseco, she was redirected to B–Line.

In short, B–Line took the position with the executrix that she needed to deal with Conseco, while Conseco took the position with her that she needed to deal with B–Line. Stymied by this double renvoi, she returned to court.

On June 2, 2003, the executrix filed an objection to Conseco's proof of claim as part of a document entitled "Findings in Support of the Memorandum Decision on Objection to Trustee's Report for Final Account and Entry of Final Decree." This document chronicled the run-around that the executrix had been subjected to by Conseco and B–Line and was served by mail on Conseco at the address listed in the proof of claim.

Acting on June 10, 2002, pursuant to the authority of Federal Rule of Bankruptcy Procedure 1001, this court entered an Order Setting Hearing on Objections to Proofs of Claim ruling that the executrix's June 2 filing was deemed "to be a motion pursuant to 11 U.S.C. § 502(j) and Federal Rule of Bankruptcy Procedure 3008 to reconsider and disallow the claims of two creditors [including Conseco] and to recover funds paid." The order further specified that "[b]asic notice requirements necessitate a continuance so that the creditors can be notified that the validity of the payments made to them is being called into question." A hearing was set for July 16, 2003.

The order, with the June 2 filing attached as an exhibit, was served by the clerk of court at the address listed on the Conseco proof of claim and, in addition, on B–Line, c/o Weinstein, Treiger & Riley, its attorney-in-fact.

On July 10, 2003, Edward J. Barton, of B–Line, e-mailed Larry Westbrook of Conseco, with a copy to Lewis H. Treiger, confirming a July 9, 2003, conversation regarding "Put–Back accounts." The mes-

---

**3.** The court did not believe the trial testimony of B–Line's chief executive officer to the effect that Mr. Clark did not have such a title and lacked authority to make representations on behalf of B–Line. It did believe the testimony of the executrix.

sage confirms that B–Line still owned the account and was trying to persuade Conseco to take it back.[4]

Neither Conseco nor B–Line appeared at the hearing on July 16, 2003, the defaults of which entities were entered. This court ruled that the account had been sold to B–Line, which entity was responsible for it. On reconsideration of the claim, it disallowed the claim and entered a judgment against B–Line for $19,413.01, which was entered on docket July 21, 2003.

B–Line's motion for reconsideration was initially heard on September 3, 2003, at which time this court vacated the default and fixed a trial for November 5, 2003. At the conclusion of trial, findings of fact and conclusions of law were announced orally on the record pursuant to Federal Rule of Civil Procedure 52. The findings stated herein supplement those findings.

B–Line filed a notice of appeal. This court subsequently granted B–Line's motion for stay pending appeal to take effect when the order is entered.

### Subject–Matter Jurisdiction

Federal subject-matter jurisdiction is founded upon 28 U.S.C. § 1334(b). The allowance or disallowance of a claim is a core proceeding that a bankruptcy judge may hear and determine. 28 U.S.C. § 157(b)(2)(9).

### Procedural Jurisdiction

This court has, for two independent reasons, jurisdiction to render this decision notwithstanding that B–Line filed a notice of appeal after the court orally announced its intended ruling.

■ First, the court's order is interlocutory, which has the consequence that an appellate court does not acquire exclusive appellate jurisdiction unless and until it grants leave to appeal. 28 U.S.C. § 158(a)(3); Fed. R. Bankr.P. 8003. The order merely requires the return to the trustee of the amount paid on the subject claim, pending a final resolution of the correct amount of the claim. While not stated in the original order, the court has a duty to determine the correct amount of a contested claim, and it does not propose to shirk that duty. *Neilson v. United States (In re Olshan)*, 356 F.3d 1078, 1083–84 (9th Cir.2004). It is conceivable that the claimant's right to the full amount of the claim will ultimately be vindicated when this court enters its final order on the claim, which order will be appealable of right as a final order under 28 U.S.C. § 158(a)(1).

■ Second, even if the order would be regarded as a final order that is appealable of right under 28 U.S.C. § 158(a)(1), the fact is that the order has not yet been entered. This court orally announced its decision and then elected to explain its

---

4. B–Line proffered the message in evidence, which stated:

The following summarize the two major open issues . . . :

   Loan # 14727999 (Frances E. Barker [SSN deleted] ) Debtor claims that Chapter 7 Trustee paid loan in full in August 2002. Conseco also repossessed and sold collateral in June 2001. The estate of the debtor claims that this resulted in excess proceeds due debtor of approximately $7,000. Loan sold to B–Line with balance of $1,125.22 in

October 2002. Debtor is deceased and heir subpoenaed Conseco for financial records on the account. They were referred to us. Given that all transactions occurred prior to sale and the account may have been sold with a materially inaccurate balance, we are requesting that Conseco take the account back and settle up with debtor's estate.

   The other 3 puts are minor & we are willing to "eat" them, given the circumstances.

decision in writing before entering an order.

The fact that a notice of appeal was filed in the interim merely means that it will be treated as having been filed on the same day and immediately after the eventual entry of the order. Fed. R. Bankr.P. 8002(a).[5]

### Discussion

The analysis begins with the executrix's standing, followed by the procedural questions regarding reconsideration of allowed claims and the substantive questions under Revised Article 9.

### I

■ Although 11 U.S.C. § 502(a) permits a party in interest to object to a claim, chapter 7 debtors often lack standing to object to claims unless the outcome of the claim objection affects them in some way. If, as is typical in chapter 7 cases, the debtor has no economic interest—direct or indirect—in whether a claim is allowed or disallowed, then the debtor may lack constitutional standing for want of: (1) an injury in fact; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the inju-ry will be redressed by a favorable decision. *United Food & Commercial Workers Union Local 751 v. Brown,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Oregon Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1108–09 (9th Cir.2003).

A chapter 7 debtor, however, unquestionably has standing when there is a surplus in the estate for the debtor after all claims are paid. 11 U.S.C. § 726(a)(6); 4 ALAN N. RESNICK, COLLIER ON BANKRUPTCY ¶ 502.02[2][c] (15th ed. rev.2003) ("COLLIER").

Thus, in this instance, the debtor's executrix has standing because sums recovered will increase the size of a chapter 7 estate that already has funds sufficient to make a distribution to the debtor pursuant to § 726(a)(6).

### II

Reconsideration of the allowance or disallowance of a claim is governed by § 502(j) and Rule 3008. 11 U.S.C. § 502(j);[6] Fed. R. Bankr.P. 3008.[7]

Section 502(j) carried forward former § 57k of the Bankruptcy Act of 1898. 11

---

**5.** The relevant portion of Rule 8002(a) is:

A notice of appeal filed after the announcement of a decision or order but before entry of the judgment, order, or decree shall be treated as filed after such entry and on the day thereof.

Fed. R. Bankr.P. 8002(a).

**6.** Section 502(j) provides:

(j) A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a holder of an allowed claim on account of such allowed claim that is not reconsidered, but if a reconsidered claim is allowed and is of the same class as such

holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder. This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

11 U.S.C. § 502(j).

**7.** Rule 3008 provides:

A party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate. The court after a hearing on notice shall enter an appropriate order.

Fed. R. Bankr.P. 3008.

U.S.C. § 93(k) (repealed 1979).[8]

■ Whether to afford relief under § 502(j) and Rule 3008 is a matter within the discretion of the trial court "according to the equities of the case." 11 U.S.C. § 502(j); *Ashford v. Consol. Pioneer Mortgage (In re Consol. Pioneer Mortgage)*, 178 B.R. 222, 225–27 (9th Cir.BAP1995); 4 COLLIER ¶ 502.11.

The rules of procedure leave the court with considerable latitude over the manner and circumstances in which the allowance of a claim is reconsidered. Thus, although Rule 3008 specifies that a § 502(j) reconsideration entails a hearing on notice, it does not provide details of such notice.

■ Since Rule 3008 reconsideration of orders regarding claim allowance and disallowance logically comes after claim objection litigation under Rule 3007, it follows that the Rule 3008 notice requirements ought to be of the same quality: "A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession and the trustee at least 30 days prior to the hearing." Fed. R. Bankr.P. 3007.

The requirement that notice be "mailed or otherwise delivered to the claimant" implicates the address that the claimant provided on the proof of claim. While Rules 3007 and 3008 are silent about which address should be used, they must be read in conjunction with Official Form 10 (Proof of Claim), which requires that the claimant provide a "name and address where notices should be sent." Official Form 10, Fed. R. Bankr.P. 9009 (mandating compliance with official forms); *cf.* Fed. R. Bankr.P.2002(g) (addressing notices).

■ Using the claimant's address on the proof of claim also comports with basic concepts of procedure. The proof of claim serves the same function as a complaint in federal civil litigation; since a debtor is already subjected to the jurisdiction of the bankruptcy court for purposes of receiving and paying claims and since the court functions as a clearinghouse for receiving claims, there is no necessity for service of a summons and a copy of the proof of claim. The objection to a claim serves the function of an answer in federal civil litigation. An answer, like an objection to claim, need only be served by mail to the last known address of the person served and is complete on mailing. *Compare* Fed.R.Civ.P. 5(b), *with* Fed. R. Bankr.P. 3007.

■ Where, as here, a claim is transferred after a proof of claim is filed, the transferee is substituted for the transferor.

---

8. The floor statements explaining § 502(j) to the House of Representatives and Senate each stated that it "codifies section 57k of the Bankruptcy Act." 124 CONG. REC. H 11,904 (daily ed. Sept. 28, 1978); *id.,* S 17,411 (daily ed. Oct. 6, 1978).

Section 57k of the Bankruptcy Act provided:

k. Claims which have been allowed may be reconsidered for cause and reallowed or rejected in whole or in part according to the equities of the case, before but not after the estate has been closed.

11 U.S.C. § 93(k) (repealed 1979).

It would have been more accurate, however, for the floor leaders to have said that Bankruptcy Rule 307 was being codified. That rule had revised § 57k to include reconsideration of orders disallowing claims and to permit post-closing reconsideration:

A party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate. If the motion is granted, the court may after hearing on notice make such further order as may be appropriate.

Bankruptcy Rule 307 (superseded 1983) (Advisory Committee note: "This rule is a substantial revision of § 57k of the Act and General Order 21(6).").

Fed. R. Bankr.P. 3001(e)(2). The transferee is required to file evidence of the transfer so that the transferor may be afforded an opportunity to object.

■ Parties in claims proceedings are entitled to rely on the addresses provided by the claimant on a proof of claim and that requirements of due process are satisfied by mailing notice to such addresses. *DeVore v. Marshack (In re DeVore)*, 223 B.R. 193, 196–97 (9th Cir. BAP 1998); *accord Greyhound Lines v. Rogers (In re Eagle Bus Mfg., Inc.)*, 62 F.3d 730, 734–36 (5th Cir.1995).

It is against the background of this settled doctrine that a transferee of a claim must decide whether to comply with Rule 3001(e)(2) and become the substituted creditor or to remain silent and trust that the transferor will forward the mail, together with any payments that are received.

One risk of not complying with Rule 3001(e)(2) and thereby changing ownership records on a filed proof of claim is that the transferee of the filed claim, in effect, appoints the transferor as its agent for receipt of notice of claim objections. An entity, such as B–Line, that is sophisticated enough to figure out how to make a profit on bankruptcy claims is correlatively charged with being sophisticated enough to know how to navigate through bankruptcy procedure. Such an entity logically needs to know whether a proof of claim has been filed and needs to provide for tracking the bankruptcy case in the event that further assets become available for distribution to creditors.

■ Thus, due process requirements were satisfied when notice of the reconsideration of the claim was sent to Conseco at the address on the proof of claim. It must be presumed from the fact that B–Line elected not to follow the Rule 3001(e)(2) procedure that it had made arrangements satisfactory to it for Conseco to notify it. Nor is this, in fact, unfair to B–Line, which actually knew of, and chose to absent itself from, the hearing. Its attorney-in-fact received separate notice specifically directed to B–Line. In sum, there is no due process defect.

### III

The proof of claim on account no. 14727999 seeks $19,413.01 as an unsecured deficiency. The challenge presented by the debtor's executrix is that the deficiency is neither adequately documented nor likely to be accurate and, hence, should not have been allowed and paid by the trustee.

### A

Reconsideration is permissible "for cause," and a reconsidered claim may be allowed or disallowed according to the "equities of the case." 11 U.S.C. § 502(j).

■ When the § 502(j) reconsideration question arises after a claim is actually paid, the requirement of "cause" connotes the need to explain why an objection was not made before it was paid. While the cause requirement is often an insurmountable hurdle, in this instance, there is a satisfactory explanation: the debtor was in his final illness, dying less than three weeks after the payment was made, and his executrix needed a while to organize his affairs to a degree that would enable her to recognize that the claim was probably objectionable and overinflated.

Thus, there is "cause" to reconsider the claim and proceed to allow or disallow it according to the equities of the case, as provided by § 502(j).

### B

■ This dispute is an action involving a consumer transaction in which a surplus

or deficiency is at issue for which Revised Article 9 of the UCC provides the rule of decision.

In this instance, the California UCC applies. The purchase was made in California by California residents. Moreover, the portion of the purchase contract that is attached to the proof of claim is a California-specific form that does not contain a contractual provision adopting the law of any other jurisdiction.

Revised Article 9, which became effective in California on July 1, 2001, "applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before" the effective date of the revision, which means that it applies in this case even though the purchase occurred in 1997. CAL. COMM.CODE § 9702 (Rev. UCC § 9–702).

The scope of Revised Article 9 extends to: "A sale of accounts, chattel paper, payment intangibles, or promissory notes." CAL. COMM.CODE § 9109(a)(3) (Rev. UCC § 9–109(a)(3)). This constitutes a marked expansion of the scope of Article 9 in two respects. First, the definition of "account" is expanded to extend beyond rights to payment for goods and services. CAL. COMM.CODE § 9102(a)(2) (Rev. UCC § 9–102(a)(2)).[9] Second, the new concept of a "payment intangible" sweeps in general intangibles under which the account debtors' principal obligation is a monetary obligation. CAL. COMM.CODE §§ 9102(a)(61) & 9109(a)(3) (Rev. UCC §§ 9–102(a)(61) & 9–109(a)(3)).[10] The term "sale" includes a sale of a participation interest or an enforcement right. CAL. COMM.CODE § 9109(a)(3) (Rev. UCC § 9–109(a)(3)) ("A sale of . . .").[11]

The sale by Conseco to B–Line of account no. 14727999 is covered by Revised Article 9 and must be analyzed as such.

As Barker's purchase agreement stipulates that the vehicle will be used for "personal, family, or household" purposes, it qualifies as an Article 9 "consumer transaction." That is, it is an obligation incurred primarily for personal, family, or household purposes secured by a security interest in collateral acquired primarily for personal, family, or household purposes. CAL. COMM.CODE § 9102(26) (Rev. UCC § 9–102(26)).

In an action in which a deficiency or a surplus regarding a "consumer transaction" is in issue, the secured party has the burden of proving compliance with UCC provisions regarding collection, enforcement, disposition, and acceptance, as well as the calculation of the deficiency. CAL.

---

9. The official UCC comment explains:

  The definition of "account" has been expanded and reformulated. It is no longer limited to rights to payment relating to goods or services. Many categories of rights to payment that were classified as general intangibles under former Article 9 are accounts under this Article.
  Rev. UCC § 9–109(a)(2), cmt. 5.a.
  California's codification nomenclature differs from the standard UCC. "Articles" are "divisions," and section numbers are not hyphenated. Each official UCC comment is restated as an Assembly Committee Comment with the nomenclature adjustments. For ease, parallel citations to Assembly comments are omitted.

10. The official UCC comment explains:

  Subsection (a)(3) expands the scope of this Article by including the sale of a "payment intangible" (defined in Section 9–102 as "[omitted]") and a "promissory note" . . .
  Rev. UCC § 9–109(a)(3), cmt. 4.

11. The official UCC comment explains:

  A "sale" of an account, chattel paper, a promissory note, or a payment intangible includes a sale of a right in the receivable, such as a sale of a participation interest. The term also includes the sale of an enforcement right.
  Rev. UCC § 9–109(a)(3), cmt. 5.

COMM.CODE § 9626(b)(1) (Rev. UCC § 9–626(b)(1)).

Here, the allegation is that the deficiency claim was overpaid and deserves to be revisited. The fact that the assertions by the executrix are credible, combined with the fact that neither Conseco nor B–Line has been willing to be forthcoming about how the deficiency amount was calculated, persuade the court that it is appropriate to reconsider the claim under § 502(j) and require the claimant to prove the amount owed.

While there are a number of alternatives for accomplishing the mechanics of that process, in the end the effect of reconsidering the claim would be to require that the claimant carry the burden of proof specified by Revised UCC § 9–626(b)(1).

The fact that the account was transferred to B–Line does not change the analysis. An assignee generally takes an assignment subject to defenses and claims of the account debtor. CAL. COMM.CODE § 9404(a) (Rev. UCC § 9–404(a)).

Moreover, Revised UCC § 9–404 ("Rights of Assignees") bootstraps into all "consumer transactions" enforcement of the provisions of Federal Trade Commission ("FTC") Rule 433, which exposes assignees to the claims and defenses of debtors (regardless of waiver), with affirmative recovery limited to the amounts paid by the debtor. CAL. COMM.CODE § 9404(d) (Rev. UCC § 9–404(d)); 16 C.F.R. § 433.2.[12]

One of the applicable defenses and claims that B–Line took the Barker account "subject to" was the claim that the deficiency balance had been overpaid.

## IV

■■■ B–Line contends that its contractual "put-back" arrangement with Conseco means that, upon B–Line's request, the sale of the Barker account no. 14727999 was retroactively voided such that it never occurred. This contention lacks merit in fact and law.

The sale of the account, in fact, occurred. B–Line had no hesitation about informing the executrix that another $1,125.00 was owed on the account and, the court infers, would have accepted payment. B–Line effectively admitted ownership of the account when, on June 10, 2003, its chief financial officer e-mailed Conseco: "we are requesting that Conseco take the account back and settle up with debtor's estate."

The standard legal consequence of a sale of an account is that the seller retains no legal or equitable interest in what is sold. Cf. CAL. COMM.CODE § 9318(a) (Rev. UCC § 9–318(a)).[13]

---

**12.** While the language of Revised § 9–404(d) may be opaque, the official comment is not:

> Subsection (d) applies to rights evidence by a record that is required to contain, but does not contain, the notice set forth in Federal Trade Commission Rule 433, 16 C.F.R. Part 433. (the "Holder–in–Due–Course Regulations"). Under subsection (d), a consumer account debtor has the same right to an affirmative recovery from an assignee of such a record as the consumer would have had against the assignee had the record contained the required notice. Rev. UCC § 9–404, cmt. 4.

FTC Rule 433 requires that consumer credit contracts contain the following contractual provision:

> Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtain with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.

16 C.F.R. § 433.2 (2003).

**13.** The official UCC comment explains:

> Subsection (a) makes explicit what was implicit but perfectly obvious, under former

The terms of the contract do not call for retroactive voiding of the transaction. To be sure, B–Line appears to have a contractual right to require that Conseco make good on its warranty that none of the assigned claims is in dispute. The "put-back" arrangement appears to be merely a mechanism between Conseco and B–Line for having Conseco make good on its warranty. It is not self-executing. The existence of that contractual right as between Conseco and B–Line, however, does not affect the rights of the account debtor.

Nor does it appear that an assignee or purchaser of an account in a consumer transaction can contract its way out of Revised Article 9, which applies by virtue of UCC § 9–109 and which exposes B–Line to liability under UCC § 9–404. CAL. COMM.CODE §§ 9109 & 9404(d) (Rev. UCC §§ 9–109 & 9–404(d)). Even if it could, B–Line has not done so in this instance.

V

■ Having concluded that the executrix has standing to question the proof of claim and that B–Line is properly before the court and exposed to the assignee's liability under Revised Article 9, the question becomes how to go about implementing the § 502(j) reconsideration process.

The legal posture is that the court has determined to reconsider the allowance of the claim on account no. 14727999 under § 502(j). This is not a final decision to disallow the claim, rather it is an interlocutory disallowance of the claim based on a determination that the actual amount of the claim that was allowed was probably incorrect and pending proof by the claimant as to the correct amount of the claim.

While the court ultimately must determine the correct amount of the claim, it has discretion over procedural details and may require that the status quo ante be restored by disgorgement pending resolution of the correct amount. In light of the run-around that B–Line and Conseco have been giving to the executrix, the sensible solution is to restore the status quo that existed before the claim was paid. Accordingly, the full $19,701.62 that was paid by the trustee must be disgorged to the trustee.

A judgment to that effect triggered the instant motion for reconsideration. In view of the nature of the evidentiary presentation at the ensuing trial, the judgment entered on docket July 18, 2003, will be vacated and replaced, on reconsideration, by another judgment for the same amount against B–Line, as the presumed owner of the funds paid by the trustee.[14] Collection

Article 9: The fact that a sale of an account or chattel paper gives rise to a "security interest" does not imply that the seller retains an interest in the property that has been sold. To the contrary, a seller of an account or chattel paper retains no interest whatsoever in the property to the extent that it has been sold. Subsection (a) also applies to sales of payment intangibles and promissory notes, transactions that were not covered by former Article 9.
Rev. UCC § 9–318(a), cmt. 2.

**14.** The court is mindful that B–Line says that the assignment occurred in October 2002 and that the chapter 7 trustee paid the $19,701.62 in August 2002. The difficulty, however, is

that B–Line placed in evidence a purchase agreement that provided for a "cut-off date" of May 31, 2002, with a closing date of June 30, 2002, and that deleted ten of twelve pages with the excuse, "redacted due to trade secrets." The purchase agreement was admitted in evidence on B–Line's representation that nothing in the redacted portion of the agreement could possibly affect the outcome and on the condition (reiterated multiple times on the record because the court demanded unambiguous waiver) that B–Line was waiving all risk that something in the redacted portion of the agreement might be material to the outcome of the dispute. Since the "cut-off date" is not ambiguous (and, by B–Line's intentional waiver, cannot be clari-

of the judgment shall be stayed pending disposition of the appeal, be it either by dismissal as interlocutory [15] or on the merits.

After the $19,701.62 is returned to the trustee, this court will proceed to determine the correct amount of the unsecured deficiency claim, which, in light of the existence of a "surplus" estate, will be paid in full with interest at the legal rate from the date of the filing of the petition per 28 U.S.C. § 726(a)(5).

A separate judgment will issue.

fied by any redacted portion of the purchase agreement), the court infers that the reference to assignment in October 2002 refers to final documentation of an assignment of an account that had been identified to the purchase agreement by the contract's defined "closing date" of June 30, 2002 (the alternative for adjusting the closing date was redacted as a trade secret). Thus, the payment that the trustee made in August 2002 belonged to B–Line, and it is appropriate and just to require B–Line to pay; if Conseco did not pass the $19,701.62 along to B–Line, that is a matter to be resolved between them.

15. This court expresses no view regarding whether leave to appeal should be granted per 28 U.S.C. § 158(a)(3).