UNITED FOOD AND COMMERCIAL WORKERS
UNION LOCAL 751 $v.$ BROWN GROUP, INC.,
DBA BROWN SHOE CO.

No. 95–340.   Argued February 20, 1996—Decided May 13, 1996

SOUTER, J., delivered the opinion for a unanimous Court.

*Laurence Gold* argued the cause for petitioner. With him on the briefs were *George Murphy, Renee L. Bowser, Marsha S. Berzon,* and *Jonathan P. Hiatt.*

*Alan Jenkins* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Deputy Solicitor General Kneedler, Thomas S. Williamson, Jr., Allen H. Feldman, Nathaniel I. Spiller,* and *Mark S. Flynn.*

*Thomas C. Walsh* argued the cause for respondent. With him on the brief were *Michael G. Biggers, James N. Foster, Jr., Michelle M. Cain,* and *Robert D. Pickle.**

JUSTICE SOUTER delivered the opinion of the Court.

The Worker Adjustment and Retraining Notification Act (WARN Act or Act), 102 Stat. 890, 29 U. S. C. § 2101 *et seq.*, obligates certain employers to give workers or their union

---

*\*Kary L. Moss* filed a brief for the American Federation of Government Employees et al. as *amici curiae* urging reversal.

60 days' notice before a plant closing or mass layoff. If an employer fails to give the notice, the employees may sue for backpay for each day of the violation, and, in the alternative, the union is ostensibly authorized to sue on their behalf. See *North Star Steel Co.* v. *Thomas*, 515 U. S. 29 (1995); Part II, *infra*.

Permitting a union to sue under the Act on behalf of its employee-members raises a question of standing. In *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333 (1977), we described a three-prong test for an association's standing to sue based on injury to one of its members. The third element, at issue here, would bar such a suit when "the claim asserted [or] the relief requested requires the participation of individual members in the lawsuit." *Id.*, at 343. Relying on *Warth* v. *Seldin*, 422 U. S. 490 (1975), *Hunt* held that "individual participation" is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such participation would be required in an action for damages to an association's members, thus suggesting that an association's action for damages running solely to its members would be barred for want of the association's standing to sue. See *Hunt, supra*, at 343.

The questions presented here are whether, in enacting the WARN Act, Congress intended to abrogate this otherwise applicable standing limitation so as to permit the union to sue for damages running to its workers, and, if it did, whether it had the constitutional authority to do so. We answer yes to each question.

I

On January 17, 1992, respondent Brown Shoe Company wrote to a representative of the United Food and Commercial Workers International Union, stating that Brown Shoe would shut down its Dixon, Missouri, plant and permanently lay off 277 employees beginning on March 20, 1992. App. 62–63. The complaint filed by petitioner United Food and

Commercial Workers Union Local 751 charged that Brown Shoe's representations were false insofar as they are relevant here, and that in fact, even before sending the letter, Brown Shoe had begun the layoffs, which continued through February and into March. App. 8–9.[1] The union accordingly claimed a violation of the WARN Act and sought the statutory remedy of 60-days' backpay for each of its affected members.

The District Court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6), saying that "when an organization seeks to recover monetary relief on behalf of its members, courts have found that such claims necessarily require participation of individual members in the suit." 820 F. Supp. 1192, 1193–1194 (ED Mo. 1993). The Court of Appeals for the Eighth Circuit affirmed, concluding that "[e]ach union member who wishes to recover WARN Act damages from Brown Shoe must participate in the suit so that his or her right to damages can be determined and the quantum of damages can be calculated by the court on the basis of particularized proof. Therefore, the union cannot meet the third part of the *Hunt* test and is precluded from asserting associational standing." 50 F. 3d 1426, 1432 (1995).[2] We granted certiorari, 516 U. S. 930 (1995), and now reverse.

---

[1] Because the District Court dismissed the complaint, for the purposes of deciding this appeal we assume the truth of this allegation. Nor do we reach the merits of, or any other issue about, the union's further complaint that Brown Shoe's letter was defective because it was sent to an individual who worked for the International. The complaint alleges that United Food Local 751, not the International or its employee, is the exclusive representative of the affected employees and is thus statutorily entitled to notice of the closing and mass layoff.

[2] The District Court had also denied the union's motion to amend its complaint to add employees as plaintiffs. App. to Pet. for Cert. 18a–19a. The Court of Appeals held that the District Court's decision in this respect did not represent an abuse of its discretion. 50 F. 3d, at 1432. The correctness of this determination is outside the scope of the questions presented here. See Pet. for Cert. i.

## II

At the outset, Brown Shoe argues that the WARN Act grants a union no authority to sue for damages on behalf of its members. Because the question on which we granted certiorari (whether Congress has the constitutional authority to alter the third prong of the associational standing enquiry) assumes that the WARN Act does grant the union such authority, Brown Shoe urges us to declare the writ of certiorari improvidently granted. In *North Star Steel*, however, we noted, contrary to Brown Shoe's position, that "[t]he class of plaintiffs" who may sue for backpay under the WARN Act "includes aggrieved employees (or their unions, as representatives)." 515 U. S., at 31, and on further consideration we have no doubt that we were reading the statute correctly.

The key requirement of the Act is found in § 2102, which prohibits an employer from ordering "a plant closing or mass layoff until the end of a 60-day period" running from the date of the employer's written notice of the closing or layoff "(1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee," and "(2) to the State dislocated worker unit . . . and the chief elected official of the unit of local government within which such closing or layoff is to occur." 29 U. S. C. § 2102(a). Congress defined the "representative" to which § 2102(a)(1) refers as the employees' union, "an exclusive representative of employees within the meaning of section 9(a) or 8(f) of the National Labor Relations Act (29 U. S. C. 159(a), 158(f)) or section 2 of the Railway Labor Act (45 U. S. C. 152)." 102 Stat. 890, 29 U. S. C. § 2101(a)(4).

Enforcement of the § 2102 notice requirement is addressed in § 2104(a), the following provisions of which answer Brown Shoe's argument. Section 2104(a)(1) makes a violating employer liable to "each aggrieved employee" for backpay and

benefits for each day of the violation.[3]   Section 2104(a)(5) provides that "[a] person seeking to enforce such liability, including a representative of employees . . . aggrieved under paragraph (1) . . . , may sue either for such person or for other persons similarly situated, or both, [in an appropriate district court]."

Since the union is the "representative of employees . . . aggrieved," it is a person who may sue on behalf of the "persons similarly situated" in order to "enforce such liability." "[S]uch liability" must refer to liability under § 2104, since its remedies are exclusive.   See 29 U. S. C. § 2104(b).   Because the section makes no provision for liability to the union itself, any "such liability" sought by the union must (so far as concerns us here) be liability to its employee-members, so long as they can be understood to be "persons similarly situated" for the purposes of the Act.   We believe they may be so understood, since each is aggrieved by the employer's failure to give timely notice.

Brown Shoe's alternative construction is unconvincing.   It contends that a previous bill would have imposed civil liability on employers who failed to notify the union of a plant

---

[3] 102 Stat. 893, as set forth in 29 U. S. C. § 2104(a)(1):

"Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—

"(A) back pay for each day of violation at a rate of compensation not less than the higher of—

"(i) the average regular rate received by such employee during the last 3 years of the employee's employment; or

"(ii) the final regular rate received by such employee; and

"(B) benefits under an employee benefit plan . . . , including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

"Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer."

closing or mass layoff, and would have permitted the union to sue to recover a penalty where an employer failed to provide the required notice. See S. 538, 100th Cong., 1st Sess. (1987). In the ultimately enacted version of the legislation, Congress eliminated this provision, with the result that the WARN Act no longer speaks to the "rights and welfare of unions," Brief for Respondent 12. Brown Shoe's argument is that the class of persons "similarly situated" is the class entitled to sue for damages, so that the elimination of the union's entitlement to a civil penalty requires the conclusion that the union is no longer "similarly situated" to "employees . . . aggrieved under paragraph (1)," and thus not permitted to sue under the Act.

The flaw in this argument is that it would force us to conclude that the provision for suits by unions is attributable only to congressional inadvertence, whereas inadvertence is not the only possible, or even plausible, explanation for the authorization. For one, the statutory reference to persons "similarly situated" can very readily be understood to mean the class of persons to whom notice is owed but not given. In this respect, the union and its members are certainly persons "similarly situated." Brown Shoe's argument also fails to explain why Congress would necessarily have intended to eliminate the union's power to sue on behalf of members (as Brown Shoe assumes the union could have done prior to the amendment) just because the union was no longer entitled to a penalty in its own right. The argument for Brown Shoe's preferred construction simply rests on one speculative possibility in opposing a straightforward reading of the provision that a union may bring suit on behalf of its members, who are "employees . . . aggrieved under paragraph (1)." Speculation loses, for the more natural reading of the statute's text, which would give effect to all of its provisions, always prevails over a mere suggestion to disregard or ignore duly enacted law as legislative oversight.

## III

This brings us to the primary question in the case: whether the union has standing to bring this action on behalf of its members.[4] Article III of the Constitution limits the federal judicial power to "Cases" or "Controversies," thereby entailing as an "irreducible minimum" that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. See, *e. g.*, *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U. S. 656, 663 (1993); *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982). Supplementing these constitutional requirements, the prudential doctrine of standing has come to encompass "several judicially self-imposed limits on the exercise of federal jurisdiction." See *Allen* v. *Wright*, 468 U. S. 737, 751 (1984); see also *Flast* v. *Cohen*, 392 U. S. 83, 97 (1968). The question here is whether a bar to the union's suit found in the test for so-called associational standing is constitutional and absolute, or prudential and malleable by Congress.

## A

The notion that an organization might have standing to assert its members' injury has roots in *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 459 (1958), where the Court noted that for the purpose of determining the scope of the

---

[4] The union also argues that it has standing because it suffered direct injury. The Court of Appeals held that the union lacked standing to assert its direct injury because neither backpay to the employees nor its "catch-all prayer for relief" would redress the union's injury. 50 F. 3d 1426, 1431, n. 7 (CA8 1995). The union argues here that its injury would be redressed because an award of damages to the employees would deter future violations and would facilitate the union's role in assisting its members. In light of our resolution of the associational standing question, we do not have occasion today to address this issue.

National Association for the Advancement of Colored People's (NAACP's) rights as a litigant, the association "and its members are in every practical sense identical." The Court accordingly permitted the NAACP to rely on violations of its members' First Amendment associational rights in suing to bar the State of Alabama from compelling disclosure of the association's membership lists. See also *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 183–187 (1951) (Jackson, J., concurring); *Barrows* v. *Jackson*, 346 U. S. 249, 255–259 (1953); *NAACP* v. *Button*, 371 U. S. 415, 428 (1963); *National Motor Freight Traffic Assn., Inc.* v. *United States*, 372 U. S. 246, 247 (1963); *Sierra Club* v. *Morton*, 405 U. S. 727, 739 (1972).

The modern doctrine of associational standing, under which an organization may sue to redress its members' injuries, even without a showing of injury to the association itself, emerges from a trilogy of cases. We first squarely recognized an organization's standing to bring such a suit in *Warth* v. *Seldin*, 422 U. S. 490 (1975).

> "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . . [S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Id.*, at 511.

*Warth*'s requirements for associational standing were elaborated in *Hunt*. There we held that the Washington State Apple Advertising Commission, a state agency whose statutory charge was to promote the State's apple industry, had standing to bring a dormant Commerce Clause challenge to a North Carolina statute forbidding the display of Washington

State apple grades on apple containers. Relying on *Warth*, the *Hunt* Court stated a three-prong associational standing test:

> "[W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U. S., at 343.

Finally, in *Automobile Workers* v. *Brock*, 477 U. S. 274 (1986), we held that a union had standing to challenge an agency's construction of a statute providing benefits to workers who lost their jobs because of competition from imports. The union there did not allege any injury to itself, nor was it argued that the members' associational rights were affected. Reaffirming and applying the three-part test emerging from *Warth* and *Hunt*, we held that the union had standing to bring the suit. 477 U. S., at 281–288. See also *Pennell* v. *San Jose*, 485 U. S. 1, 7, and n. 3 (1988).

B

The Court of Appeals here concluded that the union's members would have had standing to sue on their own (the first prong), and recognized that the interests the union sought to protect were germane to its purpose (the second prong). But it denied the union's claim of standing because it found that the relief sought by the union, damages on behalf of its members, would require the participation of individual members in the lawsuit. 50 F. 3d, at 1431. It relied on the statement in *Warth* that "[i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those

members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind." 422 U. S., at 515. These and later precedents have been understood to preclude associational standing when an organization seeks damages on behalf of its members. See, *e. g., Telecommunications Research & Action Center* v. *Allnet Communication Services, Inc.,* 806 F. 2d 1093, 1094–1095 (CADC 1986) ("[L]ower federal courts have consistently rejected association assertions of standing to seek monetary, as distinguished from injunctive or declaratory, relief on behalf of the organization's members") (collecting cases).[5]

One court has suggested that this bar is of constitutional magnitude, see *National Assn. of Realtors* v. *National Real Estate Assn., Inc.,* 894 F. 2d 937, 941 (CA7 1990) ("[A]ssociations have been held to have standing under Article III of the Constitution to seek injunctive relief—but never damages"). The Court of Appeals here apparently agreed with that suggestion, and so dismissed for lack of union standing despite the WARN Act's provision permitting the union to sue. We therefore take up the question whether the third prong of the associational standing enquiry is of constitutional character.

C

Although *Warth* noted that the test's first requirement, that at least one of the organization's members would have standing to sue on his own, is grounded on Article III as an element of "the constitutional requirement of a case or

---

[5] United Food argues that "given the simplified nature of the monetary relief here provided," Brief for Petitioner 44, n. 17, the third prong of the *Hunt* test is satisfied despite its claim for damages. In light of our conclusion that in the WARN Act Congress has abrogated the third prong of the associational standing test, we need not decide here whether, absent congressional action, the third prong would bar a "simplified" claim for damages.

controversy," *Warth, supra,* at 511, our cases have not otherwise clearly disentangled the constitutional from the prudential strands of the associational standing test. Cf. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S., at 471 ("[I]t has not always been clear in the opinions of this Court whether particular features of the 'standing' requirement have been required by Art. III *ex proprio vigore,* or whether they are requirements that the Court itself has erected and which were not compelled by the language of the Constitution"); June, The Structure of Standing Requirements for Citizen Suits and the Scope of Congressional Power, 24 Envtl. L. 761, 793 (1994) (noting uncertainty "whether requirements such as [associational] standing are constitutional or prudential in nature"). Resort to general principles, however, leads us to say that the associational standing test's third prong is a prudential one.

There are two ways in which *Hunt* addresses the Article III requirements of injury in fact, causal connection to the defendant's conduct, and redressability. First and most obviously, it guarantees the satisfaction of these elements by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association. As *Hunt*'s most direct address to Article III standing, this first prong can only be seen as itself an Article III necessity for an association's representative suit. Cf. *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U. S. 26, 40 (1976) (the association "can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right"). Hunt's second prong is, at the least, complementary to the first, for its demand that an association plaintiff be organized for a purpose germane to the subject of its member's claim raises an assurance that the association's litigators will themselves have a stake in the resolution of

the dispute, and thus be in a position to serve as the defendant's natural adversary.[6]  But once an association has satisfied *Hunt's* first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more.  See generally *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992).  To see *Hunt's* third prong as resting on less than constitutional necessity is not, of course, to rob it of its value.  It may well promote adversarial intensity.  It may guard against the hazard of litigating a case to the damages stage only to find the plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity.  And it may hedge against any risk that the damages recovered by the association will fail to find their way into the pockets of the members on whose behalf injury is claimed.  But these considerations are generally on point whenever one plaintiff sues for

---

[6] Because the union is statutorily entitled to receive notice under the WARN Act, and because of the paramount role, under federal labor law, that unions play in protecting the interests of their members, it is clear that this test is satisfied here.  We therefore need not decide whether this prong is prudential in the sense that Congress may definitively declare that a particular relation is sufficient.

The germaneness of a suit to an association's purpose may, of course, satisfy a standing requirement without necessarily rendering the association's representation adequate to justify giving the association's suit preclusive effect as against an individual ostensibly represented.  See generally *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797 (1985); *Matsushita Elec. Industrial Co.* v. *Epstein*, 516 U. S. 367, 395–399 (1996) (GINSBURG, J., concurring in part and dissenting in part).  See also *Automobile Workers* v. *Brock*, 477 U. S. 274, 289 (1986) ("[A]n association might prove an inadequate representative of its members' legal interests for a number of reasons"); Note, Associational Standing and Due Process: The Need for an Adequate Representation Scrutiny, 61 B. U. L. Rev. 174 (1981).  In this case, of course, no one disputes the adequacy of the union, selected by the employees following procedures governed by a detailed body of federal law and serving as the duly authorized collective-bargaining representative of the employees, as an associational representative.  See generally *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575 (1969).

another's injury. And although we noted in *Flast* that "a litigant will ordinarily not be permitted to assert the rights of absent third parties," 392 U. S., at 99, n. 20; see also *Valley Forge, supra,* at 474, we recognized in *Allen* v. *Wright,* 468 U. S., at 751, that "the general prohibition on a litigant's raising another person's legal rights" is a "judicially self-imposed limi[t] on the exercise of federal jurisdiction," not a constitutional mandate. Indeed, the entire doctrine of "representational standing," of which the notion of "associational standing" is only one strand, rests on the premise that in certain circumstances, particular relationships (recognized either by common-law tradition[7] or by statute[8]) are sufficient to rebut the background presumption (in the statutory context, about Congress's intent) that litigants may not assert the rights of absent third parties. Hence the third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution.

Circumstantial evidence of the prudential nature of this requirement is seen in the wide variety of other contexts in which a statute, federal rule, or accepted common-law practice permits one person to sue on behalf of another, even where damages are sought. "[R]epresentative damages litigation is common—from class actions under Fed. R. Civ. P. 23(b)(3) to suits by trustees representing hundreds of creditors in bankruptcy to *parens patriae* actions by state governments to litigation by and against executors of decedents' estates." *In re Oil Spill by the Amoco Cadiz off the Coast of France on Mar. 16, 1978,* 954 F. 2d 1279, 1319 (CA7 1992) *(per curiam).* In addition, § 706(f)(1) of Title VII of the

---

[7] See, *e. g., Whitmore* v. *Arkansas,* 495 U. S. 149 (1990) (recognizing a next-friend's standing).

[8] See, *e. g.,* Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.,* and the Fair Labor Standards Act of 1938, 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.*

Civil Rights Act of 1964, 42 U. S. C. § 2000e–5(f)(1), expressly authorizes the Equal Employment Opportunity Commission to sue for backpay on behalf of employees who are victims of employment discrimination, *General Telephone Co. of Northwest* v. *EEOC*, 446 U. S. 318 (1980), and the Fair Labor Standards Act of 1938, 29 U. S. C. § 201 *et seq.*, contains a comparable provision permitting the Secretary of Labor to sue for the recovery of unpaid minimum wages and overtime compensation, 29 U. S. C. § 216(c). If these provisions for representative actions were generally resulting in nonadversarial actions that failed to resolve the claims of the individuals ultimately interested, their disservice to the core Article III requirements would be no secret. There is no reason to expect that union actions under the WARN Act portend any greater Article III incursions.

## D

Because Congress authorized the union to sue for its members' damages, and because the only impediment to that suit is a general limitation, judicially fashioned and prudentially imposed, there is no question that Congress may abrogate the impediment. As we noted in *Warth*, prudential limitations are rules of "judicial self-governance" that "Congress may remove . . . by statute." 422 U. S., at 509. It has done so without doubt in this instance.

\*　　\*　　\*

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*