**ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, et al., Plaintiffs,**

v.

**Roman STEARNS, et al., Defendants.**

**No. CV 05–06242 SJO (MANx).**

United States District Court, C.D. California.

Aug. 8, 2008.

**982**

Robert H. Tyler, Advocates for Faith and Freedom, Murrieta, CA, Jonathan T McCants, Bird & Loechl, Wendell Raleigh Bird, Jennifer Lynn Monk, Bird Loechl Brittain and McCants LLC, Atlanta, GA, for Plaintiffs.

Bradley S. Phillips, Munger Tolles & Olson, Los Angeles, CA, Michelle T. Friedland, Stuart N. Senator, Rebecca Gose Lynch, Munger Tolles and Olson LLP, San Francisco, CA, Christopher M. Patti, James E. Holst, University of California, Oakland, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' "MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' AS-APPLIED CLAIMS" [Docket No. 172]

S. JAMES OTERO, District Judge.

This matter is before the Court on Defendants' "Motion for Summary Judgment on Plaintiffs' As-Applied Claims," filed May 28, 2008. Plaintiffs filed an Opposition, to which Defendants replied. The Court heard oral argument from the parties on July 18, 2008. (Docket No. 221.) Because Plaintiffs fail to raise a genuine issue of material fact in support of their "as-applied" claims, Defendants' Motion is GRANTED.

### I. BACKGROUND

Plaintiffs—Calvary Chapel Christian School ("Calvary"), five Calvary students, and the Association of Christian Schools International ("ACSI")—brought suit against Defendants—several University of California ("UC") employees—for developing and implementing an admissions process that allegedly violates the Free Speech Clause, the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause.

UC admits most California applicants based on achievement in high school courses and standardized tests. However, UC only considers courses that it has approved to ensure that admitted students took courses that provided those students with the knowledge and skills to succeed in their studies at UC.[1]

The focus of Plaintiffs' suit is the method by which UC approves high school

---

1. This Court's "Order Denying Plaintiffs' Motion for Summary Judgment and Granting Defendants' Motion for Partial Summary Judgment" (the "Prior Order") describes the UC admissions process in greater detail. (Prior Order 1–4.)

courses. Plaintiffs allege that this method is unconstitutional on its face and as applied to specific courses.

Earlier this year, the Court ruled on one round of summary judgment motions brought by the parties. In those motions, Defendants requested summary judgment only on Plaintiffs' facial claims, while Plaintiffs requested summary judgment on all of their claims—both facial and as-applied. After determining that Defendants' policies and actions are subject to rational basis review, the Court granted summary judgment in favor of Defendants on Plaintiffs' facial claims. Plaintiffs' request for summary judgment was denied in its entirety, leaving Plaintiffs' as-applied claims remaining for adjudication. Upon the parties' request, the Court granted Defendants leave to file a second summary judgment motion concerning Plaintiffs' as-applied claims.

Now, Defendants move for summary judgment on Plaintiffs' as-applied claims.

## II. DISCUSSION

Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material act and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "material" fact is one that could affect the outcome of the case, and an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Plaintiffs identify 38 courses[2] proposed by religious schools and rejected by UC that Plaintiffs believe were unconstitutionally denied approval. Defendants argue that they are entitled to summary judgment for numerous procedural and substantive reasons.

### A. Defendants' Procedural Arguments

Defendants offer several reasons why they are entitled to summary judgment as to most of the course rejections without addressing the merits of Plaintiffs' as-applied claims: (1) Plaintiffs do not have standing to challenge UC's decision to reject courses offered by schools other than Calvary; (2) Plaintiffs failed to raise most of their as-applied claims in a timely manner; and (3) Plaintiffs failed to timely disclose expert conclusions regarding individual course decisions.[3]

### 1. Standing for Non–Calvary Course Decisions

Defendants contend that Plaintiffs do not have standing to pursue their claims regarding UC's rejection of courses taught at schools other than Calvary. (MSJ 8.) ACSI, an organization of Christian schools, claims that it has associational standing to pursue as-applied claims on behalf of its member schools that had courses rejected.

Associational standing permits an organization to litigate as a representative of its members if: "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are ger-

---

**2.** Plaintiffs originally filed a list of 41 challenged course decisions (Docket No. 167), but withdrew three of those challenges (Docket No. 192).

**3.** Defendants also argue: (1) Plaintiffs do not have standing for prospective injunctive re-

lief; (2) Plaintiffs' challenges regarding seven of the course decisions are barred by the statute of limitations; and (3) Plaintiffs' expert opinions are given by individuals addressing subject matter outside their field of expertise. The Court does not address these issues.

mane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Defendants concede that ACSI satisfies prongs (a) and (b) of the *Hunt* test, arguing only that ACSI does not satisfy prong (c) because the claims asserted and the relief requested require the participation of individual members. Plaintiffs counter that its claims and relief do not require the participation of individual members and, even if they did, Defendants waived their objection.

### a. *Defendants Did Not Waive Their Standing Objection.*

■ Generally, standing cannot be waived if based on constitutional requirements imposed by Article III. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). Constitutional standing requires at a minimum: "(1) an injury in fact[;] (2) a causal relationship between the injury and the challenged conduct[;] and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.*

■ However, federal courts also impose judicially created "prudential" stand-

ing requirements that further limit their jurisdiction. *Id.* Prudential elements of standing, unlike the constitutional requirements, can be waived if they are "not properly raised before the district court." *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.,* 219 F.3d 895, 900 (9th Cir.2000).

The third prong of the associational standing test is prudential. *United Food,* 517 U.S. at 555–57, 116 S.Ct. 1529 ("Resort to general principles, however, leads us to say that the associational standing test's third prong is a prudential one.").[4] Accordingly, a standing challenge based on this prong may be waived if it is not timely asserted or "if the time and manner" is merely "strategic." *See Pershing Park,* 219 F.3d at 900.[5]

Although Defendants did not object to associational standing until this recent Motion for Summary Judgment, that objection is timely raised in light of the circumstances of this case. Until this Motion, Plaintiffs had not identified any as-applied challenges to non-Calvary courses.

Accordingly, Defendants may challenge ACSI's associational standing.

### b. *ACSI Does Not Have Associational Standing.*

Whether an organization satisfies the third *Hunt* prong depends on the claims it

---

**4.** The first two *Hunt* prongs "address[ ] the Article III requirements" for standing and cannot be waived. *United Food,* 517 U.S. at 555, 116 S.Ct. 1529.

**5.** Defendants argue that "the Ninth Circuit has not treated *Hunt's* third prong as waivable, instead reviewing challenges to associational standing ... even when standing had not been raised in the district court." (Reply 6 (citing *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,* 950 F.2d 1401, 1405 (9th Cir.1991) (analyzing associational standing as a form of constitutional standing, which cannot be waived)).) Since the Ninth

Circuit's decision in *Associated General Contractors,* the Supreme Court ruled in *United Food* that *Hunt's* third prong is prudential and therefore may be waived. "[W]here intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority[,] ... district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir.2003). Even if *Associated General Contractors* supports Defendants' assertion that associational standing cannot be waived, it has been effectively overruled by *United Food.*

asserts and the relief it requests. The more specific claims and relief are to individual organization members, the less likely it is that the organization has standing. Courts are likely to grant associational standing where "the [l]aw does not require the participation of individual [association] members, [because] there is complete identity between the interests of the consortium and those of its member[s] . . . and the necessary proof could be presented 'in a group context.' " *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 10 n. 4, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (quoting *Hunt*, 432 U.S. at 344, 97 S.Ct. 2434). Similarly, associational standing is often granted where the challenge raises a pure question of law that is not specific to individual members. *See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 35 (1st Cir.1990) (citing *Auto. Workers v. Brock*, 477 U.S. 274, 286, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986)).

Both parties propose general rules in support of their positions. Plaintiffs argue that an organization generally holds associational standing if it brings suit for declaratory relief. (Opp'n 5 ("*Hunt* itself says (unanimously) that it is met by an association's constitutional claims in a declaratory and injunctive suit (such as this) . . . .").) Defendants argue that an organization generally does not hold associational standing if it brings an as-applied challenge. (MSJ 10 ("Courts in the Ninth Circuit have repeatedly held that organizations lack associational standing to bring as-applied constitutional claims, as opposed to facial claims.").)

▪ Here, Plaintiffs seek declaratory relief on their as-applied claims. This challenge seemingly falls into both of the parties' general categories, leaving ACSI with and without standing. However, further inquiry into the claims asserted and relief requested reveals that ACSI does not have standing.

First, Plaintiffs' claim for declaratory relief is individualized. As an initial matter, Plaintiffs do not make clear what specific declaratory relief they seek regarding their as-applied claims. Defendants suggest that Plaintiffs seek an order that Defendants must reconsider (or perhaps approve) specific proposed courses. (MSJ 13.) Plaintiffs do not rebut this assertion.

This individualized declaratory relief does not fit the mold of injunctive relief that Plaintiffs argue has been approved by the Supreme Court. Relying on *Hunt*, Plaintiffs argue that declaratory relief begets standing because " 'neither the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context.' " (Opp'n 5 (quoting *Hunt*, 432 U.S. at 344, 97 S.Ct. 2434).) Yet, the individualized nature of each course rejection inhibits any resolution "in a group context."

▪ Plaintiffs' other Supreme Court quotation also demonstrates why ACSI does not have associational standing. "[A]ssociational standing does not exist for damages suits because 'damages claims are not common to the entire membership, nor shared by all in equal degree' . . . ." (Opp'n 5 (quoting *Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).) This reasoning applies equally to Plaintiffs' as-applied challenges. Individual course decisions "are not common to the entire membership." Relief would not be "shared by all in equal degree." Instead, each course decision affects only one ACSI school, and relief would benefit only that school.

▪ Second, "the relief sought is only half the story." *Rent Stabilization Ass'n of City of N.Y. v. Dinkins*, 5 F.3d 591, 596 (2d Cir.1993). Even if Plaintiffs' individualized declaratory relief request did not prohibit associational standing, the individ-

ualized nature of Plaintiffs' as-applied claims would bar standing. When the claims require an "ad hoc factual inquiry" for each member represented by the association, the organization does not have associational standing. *See Dinkins*, 5 F.3d at 596 (2d Cir.1993). For example, in *Rent Stabilization Ass'n*, an association representing landlords claimed that some of its members suffered takings as a result of the government's rent stabilization scheme. *Id.* at 592–93. This association sought declaratory relief. *Id.* at 596. Yet, the court denied associational standing because it "would have [had] to engage in an ad hoc factual inquiry for each landlord who allege[d] that he ha[d] suffered a taking" to determine whether a taking had occurred. *Id.*

Plaintiffs contend that the Ninth Circuit has allowed associational standing for as-applied challenges. However, the cases Plaintiffs cite in support of this proposition are distinguishable from the circumstances of this case. *See, e.g., Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 937–38 (9th Cir. 1987) (finding associational standing where members sought declaratory relief that two government agreements affecting all of Alaska were void).

Accordingly, ASCI does not have associational standing to pursue as-applied claims based on individual course rejections.

### 2. *Plaintiffs' Recently Disclosed As-Applied Claims and Evidence.*

Defendants also argue that they have been unfairly surprised because Plaintiffs did not raise most of their as-applied challenges until May 1, 2008 and failed to disclose nearly all of the expert opinions they rely on in their Opposition until June 18, 2008.

#### a. *Plaintiffs' Recently Disclosed Claims*

Defendants object that Plaintiffs failed to identify the specific course decisions that are the subject of their as-applied claims until May 1, 2008. Plaintiffs argue that they revealed the specific courses they seek to challenge through their Complaint, discovery, and prior motion for summary judgment.

First, Plaintiffs' Complaint only specifically identifies courses proposed by Calvary. Second, Defendants served Plaintiffs with an interrogatory specifically asking Plaintiffs "to identify all courses at any ASCI-affiliated school for which Plaintiffs contend [course] approval was improperly refused." (Friedland Decl. Ex. 10.) Plaintiffs responded that "ACSI is aware of various courses at [Calvary] being rejected by UC, is aware of biology and history courses of Grace Baptist Schools of Redding, Cal. being rejected, is aware of biology courses of Calvary Baptist Schools of LaVerne, Cal. being rejected, and has heard of various other biology and physics courses being rejected by UC." (Friedland Decl. Ex. 10.) Plaintiffs failed to update or supplement this response.

In addition, Plaintiffs brought a motion for summary judgment on their facial and as-applied claims. Yet, Plaintiffs did not identify the specific courses it was challenging. Plaintiffs provided no argument on their as-applied claims, focusing only on their facial claims. Although Plaintiffs referred to a declaration containing a list of hundreds of courses, most of these courses were submitted by non-ACSI schools and the declaration did not purport to bring as-applied challenges to these courses. (Watters Decl. Apps. A–C.)

■ Plaintiffs failed to disclose which non-Calvary courses they sought to challenge "as-applied." Although Defendants have always known which ACSI schools' courses UC had rejected, Defendants did not know which courses Plaintiffs sought to litigate. Defendants rejected more than 175 courses proposed by ACSI schools

during the relevant time period. At no point, did Plaintiffs specify which of these 175 courses it would challenge through as-applied claims.

To hold that Defendants' knowledge of which courses were rejected is sufficient notice as to Plaintiffs' as-applied claims would have forced Defendants to prepare to defend every single rejection of an ACSI school's course. Defendants' experts would have had to evaluate 175 course descriptions in anticipation of trial.

Accordingly, Plaintiffs waived their as-applied claims as to courses not specifically identified.

### b. *Plaintiffs' Recently Disclosed Expert Conclusions*

Defendants object that Plaintiffs present new expert testimony in support of their claims. Plaintiffs identified their as-applied challenges on May 1, 2008, and then asked their experts to provide opinions on the reasonableness of those course rejections. The newly acquired expert affidavits, in which the experts analyze each of Plaintiffs' 38 challenged course rejections, were signed by the experts on June 12, 2008 (Vitz), June 12, 2008 (Stotsky), June 9, 2008 (Behe), and June 13, 2008 (Guevara).

■ The discovery deadline passed on July 15, 2007. Federal Rule of Civil Procedure 26(a)(2)(C) required all expert discovery to be complete at least by August 21, 2007, 90 days before the trial date. (Docket No. 48.) One month after this expert discovery deadline passed, this Court continued the trial date indefinitely in light of the massive volume of filings and issues presented by the first round of summary judgment motions. (Docket No. 145.) This continuance did not revive the discovery period for experts.

Nearly all of the relevant opinions in Plaintiffs' recently obtained expert affidavits were not disclosed in those experts' reports. Expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and the "data or other information considered by the witness in forming them." Fed.R.Civ.P. 26(a)(2)(B)(I)-(ii).

Under Rule 37(c)(1), opinions not included in expert reports must be excluded unless the lack of disclosure was "substantially justified" or "harmless." Plaintiffs make no argument that their failure to disclose these opinions was justified. At oral argument, Plaintiffs conceded that they did not prepare for the as-applied challenges because they did not expect the Court to reach those claims. (Tr. of July 18, 2008 MSJ Hearing 17 ("Had the Court ruled that there were [discriminatory] policies, and that they were unconstitutional, the Court would never have had reason to get to particular courses."), 18 ("[F]rom our standpoint, the time for doing so had not come and would not come if your Honor ruled in our favor on our motion for summary judgment [as to our facial] claims.").)

Clearly, Defendants are prejudiced as they are unable to have their experts rebut the opinions of the Plaintiffs' experts. The sanction of exclusion is "a self-executing, automatic sanction to provide a strong inducement for disclosure of material" and "gives teeth to [the Rule 26 disclosure] requirements...." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir.2001) (internal quotation marks omitted).

Accordingly, Plaintiffs' recently acquired expert opinions will be excluded.

### B. *Defendants' Substantive Arguments*

Remaining are Plaintiffs' as-applied challenges to four rejected Calvary courses and a Biology course identified in Plaintiffs' interrogatory response. Plaintiffs ar-

gue that Defendants' decisions to deny approval for these courses violate the Free Speech Clause, Free Exercise Clause, Establishment Clause, and Equal Protection Clause. Each clause is addressed in turn.

### 1. *Free Speech Clause*

Plaintiffs primarily argue that Defendants engaged in viewpoint discrimination and content regulation prohibited by the Free Speech Clause. As discussed in the Prior Order, Defendants necessarily facilitate some viewpoints over others in judging the excellence of those students applying to UC. Therefore, the decision to reject a course is constitutional as long as: (1) UC did not reject the course because of animus; and (2) UC had a rational basis for rejecting the course.

### a. *Animus*

Defendants argue that Plaintiffs waived any animus argument when Plaintiffs' counsel stated "We do not intend to argue the case based on proving animus" at the hearing on the parties' first round of summary judgment motions. (Tr. of Feb. 14, 2008 MSJ Hearing 39.) Plaintiffs dispute this argument, explaining that they did not intend to argue animus until this Court used that term to describe the punishment of disfavored viewpoints prohibited by *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998).

Regardless of whether Plaintiffs waived this issue, they fail to present evidence of animus sufficient to raise a genuine issue of material fact. The prototypical example of government animus is found in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).[6] There, the city council passed an ordinance prohibiting some, but not all, forms of animal killing so that members of the Santeria religion could not sacrifice animals during their worship ceremonies at a local church. "[T]he record ... compel[led] the conclusion that suppression of the central element of the Santeria worship service was the object of the [city] ordinance," *id.* at 534, 113 S.Ct. 2217, in part because of comments made at a city meeting at which the issue was addressed.

One councilman said that Santeria devotees "are in violation of everything this country stands for" and another asked "[w]hat can we do to prevent the Church from opening?" *Id.* at 541, 113 S.Ct. 2217. A city official told the city council that Santeria was a sin, "foolishness," "an abomination to the Lord," and the worship of "demons" and urged the city council "not to permit this Church to exist." *Id.* at 541–42, 113 S.Ct. 2217. Also, the city attorney commented that the ordinance indicated that "[t]his community will not tolerate religious practices which are abhorrent to its citizens." *Id.* at 542, 113 S.Ct. 2217.

This evidence of animus demonstrated that the city used an ordinance that otherwise has a rational basis to punish a disfavored viewpoint. Similarly, Plaintiffs would have to show that Defendants rejected the challenged courses to punish religious viewpoints rather than out of rational concern about the academic merit of those religious viewpoints.

Here, Plaintiffs provide no evidence of animus. Instead, Plaintiffs essentially argue that Defendants had no rational basis for their actions and therefore they must have been motivated by animus. This argument adds nothing to the constitutional analysis; if Defendants had no rational basis, the Court need not reach the issue of animus.

Accordingly, there is no genuine issue of material fact as to this issue. Defendants'

---

6. In a subsequent case, the Supreme Court characterized the animus in *Lukumi* as "manifest." *Locke v. Davey*, 540 U.S. 712, 724, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004).

decisions to reject the courses challenged by Plaintiffs were not motivated by animus.

### b. *Rational Basis Review*

Defendants' course approval decisions are subject to rational basis review. (Prior Order 37.) Under rational basis review, government regulation is "accorded a strong presumption of validity." *Heller v. Doe by Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Rationality review "is not a license for courts to judge the wisdom, fairness, or logic of government regulation." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211(1993); *see also City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) ("[T]he judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations."). "The burden is on the one attacking the [regulation] to negative every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973); *see also Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("When conducting rational basis review the court will not overturn ... government action unless [it] is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.").

"When judges are asked to review the substance of a genuinely academic decision ..., they should show great respect for the faculty's professional judgment." *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). "Plainly, [courts] may not override [this judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* Indeed, "restrained judicial review of the substance of academic decisions" enables academic freedom to thrive. *Id.; see also id.* at 226 n. 12, 106 S.Ct. 507 ("Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself ....") (internal citations omitted).

Plaintiffs challenge Defendants' decision to reject four Calvary courses and a non-Calvary Biology course.[7] To survive summary judgment, Plaintiffs must offer enough facts to create a genuine issue of material fact as to whether no rational basis existed to reject a course.

### i. *Calvary's English Course— Christianity and Morality in American Literature*

Plaintiffs challenge Defendants' decision to deny approval for *Christianity and Morality in American Literature,* an English course submitted by Calvary. (*See* Pls.' Ex. 617; Costales Decl. Tab 1.)

This course proposed a primary text published by A Beka titled *Classics for Christians.* Jeanne Hargrove, a UC course reviewer, found this text inappropriate as a primary text in English because its "selection of works and pedagogical apparatus were inconsistent with ... expectations regarding critical thinking and broad exposure to writers' key works." (Hargrove Decl. ¶ 5.)

Defendants' English expert, Professor Samuel Otter,[8] concurs, finding the text

---

**7.** Although Plaintiffs identified two other courses in its interrogatory response, their list of as-applied claims does not include these courses and their Opposition does not address them.

**8.** Professor Otter has taught American litera-

inadequate for a college-preparatory English class because it "fails to provide substantial readings and because it insists on specific interpretations [of those readings]" (Otter Decl. Ex. A, at 4.) "Such a combination contradicts the emphasis on analytical and critical thinking required [by the A–G Guidelines]." (Otter Decl. Ex. A, at 7.) These deficiencies rendered the text inadequate to provide "analytical and critical skills." (Otter Decl. Ex. A, at 4.) Further, Professor Otter specifically notes that the text's failures are "not because it offers a 'Christian and civic' perspective on its materials . . . ." (Otter Decl. Ex. A, at 4.)

In addition, the primary text is an "anthology of excerpts," which UC does not approve, no matter the content of the excerpts. "College-preparatory courses are expected to require students to read full-length works." (Lynch Decl. No. 1 Ex. 2, at 5.) Plaintiffs' English expert, Dr. Sandra Stotsky,[9] agreed in her deposition that a general rule against anthologies of excerpts is reasonable. (Lynch Decl. No. 2 Ex. 104.)

Plaintiffs offer little admissible evidence to the contrary. Dr. Stotsky submitted a declaration comparing the viewpoints of several English texts, including the A Beka anthology. (Watters Decl. Ex. W.) However, she does not refute Professor Otter's conclusions that the text is inappropriate for college-preparatory work and insists on specific interpretations of its content. Dr. Stotsky also does not opine

that Defendants unreasonably rejected this course.

■ Accordingly, there is no genuine issue of material fact as to this issue. Defendants had a rational basis for rejecting Calvary's proposed English course.

### ii. Calvary's History Course— Christianity's Influence on America

Plaintiffs challenge Defendants' decision to deny approval for *Christianity's Influence on America,* a History course submitted by Calvary. (*See* Pls.' Ex. 607.)

This course proposed a primary text published by Bob Jones University ("BJU") titled *United States History for Christian Schools.* (Pls.' Ex. 607, at 11.)[10] Professor James Given, while on the UC course review committee, reviewed this text and concluded that the text failed to adequately teach critical thinking and modern historical analytic methods. Professor Given reached this conclusion because the text:

> instructs that the Bible is the unerring source for analysis of historical events, attributes historical events to divine providence rather than analyzing human action, evaluates historical figures and their contributions based on their religious motivations or lack thereof and contains inadequate treatment of several

ture for sixteen years at the University of California, Berkeley. (Otter Decl. Ex. A, at 3.)

9. Dr. Stotsky is an independent researcher and consultant in education. She received her doctorate in reading research and reading education from the Harvard Graduate School of Education and serves on the National Mathematics Advisory Panel. (Stotsky Decl. Ex. 1.)

10. Plaintiffs argue that this course proposed "a secular text as well as the [BJU] textbook, and those secular texts ensured that standard content and required skills were taught." (Opp'n 17 (internal citations omitted).) The only other text listed on the course description is *Pilgrims in Their Own Land: 500 Years of Religion in America.* Plaintiffs offer no admissible evidence for their contention that this "secular text ensured that standard content and required skills were taught."

major ethnic groups, women, and non-Christian religious groups. (Given Decl. ¶ 8.)

Defendants' History expert, Professor Gary Nash,[11] concurred with Professor Givens' evaluation, finding that the text should not be used as the primary text for a college-preparatory History course. (Nash Decl. Ex. A, at 6.) Specifically, Nash found that the text failed to encourage "historical thinking skills and analytical thinking" and failed to cover "major topics, themes, and components of United States history." (Nash Decl. Ex. A, at 6.)

"From reading the [reviewed text], students will have little opportunity to exercise independent judgment, to sharpen their critical thinking skills, or to consider multiple perspectives of those who made our history." (Nash Decl. Ex. A, at 9.) These students "will have difficulty understanding history as a discipline as it has been practiced since Herodotus and Thucydides—a never-ending quest to reconstruct the past based on new evidence and informed by new questions posed about the functioning of past societies." (Nash Decl. Ex. A, at 9.)

Plaintiffs offer little admissible evidence to the contrary. Plaintiffs' History expert, Professor Paul Vitz, submitted a declaration concluding that the BJU text covers the "basic facts, events, and issues of [United States] history...." (Watters Decl. Ex. X ¶ 34.) However, he does not refute Professor Given's and Professor Nash's conclusions that the text fails to teach historical analytic methods. Professor Vitz also does not opine that Defendants unreasonably rejected the course.

█ Accordingly, there is no genuine issue of material fact as to this issue.

Defendants had a rational basis for rejecting Calvary's proposed History course.

### iii. *Calvary's Government Course— Special Providence: Christianity and the American Republic*

Plaintiffs challenge Defendants' decision to deny approval for *Special Providence: Christianity and the American Republic,* a Government course submitted by Calvary. (*See* Pls.' Ex. 608.)

This course proposed a primary text published by BJU titled *American Government for Christian Schools.* (Pls.' Ex. 608, at 37.) The UC reviewer found that "the content of the course outline[ ] ... is not consistent with the empirical historical knowledge generally accepted in the collegiate community." (Costales Decl. Tab 3.)

Defendants' Government expert, Professor Mark Petracca concurred,[12] evaluating the BJU Government text and finding that "[u]se of this [text] as the principal text in a United States Government course will not provide adequate preparation for study at UC." (Petracca Decl. Ex. A, at 2.) Professor Petracca found that the BJU Government text does not acknowledge the commonly-accepted framework for scholarly analysis and provides little opportunity for critical thinking. (Petracca Decl. Ex. A, at 2.) In addition, the text contains "many factual and empirical assertions that are not generally accepted among political scientists [or] historians and that are nevertheless not substantiated within the text by evidence." (Petracca Decl. Ex. A, at 3.)

Plaintiffs offer little admissible evidence to the contrary. Plaintiffs' Government expert, Professor Vitz, submitted a decla-

---

**11.** Professor Nash has taught History at the University of California, Los Angeles for "nearly forty years." (Nash Decl. Ex. A, at 3.)

**12.** Professor Petracca has served for nine years as the Chair of the Department of Political Science at the University of California, Irvine. (Petracca Decl. Ex. A, at 4.)

ration concluding that the BJU Government text "appear[s] to give a reasonably adequate presentation of the basic subject matter—the nature of the American government...." (Watters Decl. Ex. X ¶ 55.) However, he does not refute Professor Petracca's conclusions that the text does not acknowledge the commonly-accepted framework for scholarly analysis and contains factual and empirical assertions that are not generally accepted. Professor Vitz also does not opine that Defendants unreasonably rejected the course.

■ Accordingly, there is no genuine issue of material fact as to this issue. Defendants had a rational basis for rejecting Calvary's proposed Government course.

#### iv. Calvary's Elective Course— World Religions

Plaintiffs challenge Defendants' decision to deny approval for *World Religions,* an elective course submitted by Calvary.

Defendants rejected this course for both History and elective credit. The feedback provided to Calvary regarding this course is telling. As an initial matter, Defendants rejected the course as an elective because the course was "intended for 9–12th graders and does not have a prerequisite...." (Costales Decl. Tab 4, at 54.) Defendants noted that this deficiency could be corrected by "redesign[ing] the course for 11th/12th graders only" or "add[ing] an appropriate prerequisite." Plaintiffs do not argue that these bases for rejection are irrational.

In addition, Defendants noted three substantive deficiencies in the course description and offered to approve the course if Calvary clarified these issues. (Costales Decl. Tab 4, at 54.) First, Defendants

could not confirm that the proposed text, *World Religions* by Dan Halverson, existed, and asked Calvary to accurately identify the text. Second, Defendants asked Calvary to provide further information about key assignments. Finally, Defendants asked Calvary to demonstrate how the course treats the study of religion from the standpoint of scholarly inquiry. Defendants' religion expert, Professor Robert Sharf,[13] testified that these decisions were reasonable.

Plaintiffs offer little admissible evidence to the contrary. Plaintiffs' religion expert, Professor Daniel Guevara, offers no opinion specific to this course. (Watters Decl. Ex. H.) Further, Plaintiffs offer nothing to refute Defendants' evidence that it had a rational basis for rejecting the course completely unrelated to its subject matter. Finally, the course rejection feedback makes clear that the course may have been approved with minimal clarification. Plaintiffs provide no evidence that Calvary attempted to clarify the course content and received a second rejection.

■ Accordingly, there is no genuine issue of material fact as to this issue. Defendants had a rational basis for rejecting Calvary's proposed elective course.

#### v. The Non–Calvary Biology Course

Plaintiffs challenge Defendants' decision to deny approval for the Biology course submitted by Calvary Baptist School. Although Calvary Baptist has a similar name, it is not the same school as Calvary.

This course proposed a primary text published by A Beka titled *Biology: God's Living Creation.* (Pls.' Ex. 624, at 40.) UC Professor Barbara Sawrey reviewed this text and concluded that it was inap-

---

**13.** Professor Sharf is the Director of Religious Studies at the University of California, Berke- ley. (Sharf Decl. Ex. A, at 3–4.)

propriate for use as the primary text in college-preparatory science classes. (Sawrey Decl. ¶ 3.) Professor Sawrey found the text problematic because it characterized religious doctrine as scientific evidence, included scientific inaccuracies, failed to encourage critical thinking, and took an "overall un-scientific approach to the subject matter." (Sawrey Decl. ¶ 3.) [14]

Sawrey's "judgment was based not on the fact that the textbooks contained religious references and viewpoints, but on [her] conclusion that [the texts] would not adequately teach students the scientific principles, methods, and knowledge necessary for them to successfully study those subjects at UC." (Sawrey Decl. ¶ 3.) [15] After forming her conclusions, Professor Sawrey shared her findings with other members of the course review committee, who supported her conclusions. (Sawrey Decl. ¶ 4.)

Defendants' biology experts, Professors Donald Kennedy [16] and Francisco Ayala, [17] reviewed the A Beka text and a second Biology text published by BJU and concurred in her judgment. Professor Kennedy determined that "[b]y teaching students to reject scientific evidence and methodology whenever they might be inconsistent with the Bible ... both texts fail to encourage critical thinking and the skills required for careful scientific analysis." (Kennedy Decl. Ex. A, at 8.) Professor Ayala found that the texts "reject the methodology generally accepted in science, which relies on observation and experimentation and on the formulation of laws and theories that need to be tested rather than accepted on the basis of the Bible or any other authority." (Ayala Decl. Ex. A, at 4.)

Both professors concluded that neither the A Beka nor the BJU Biology texts are appropriate for use as the principal text in a college preparatory biology course. (Ayala Decl. Ex. A, at 28; Kennedy Decl. Ex. A, at 20.) In making this finding, Professor Kennedy reiterated Professor Sawrey's initial conclusion that "the problem is not ... that the creationist view is taught as an alternative to scientific explanations, but that the nature of science, the theory of evolution, and critical thinking are not taught adequately." (Kennedy Decl. Ex. A, at 7.)

14. The UC Position Statement on Science Courses reflects these concerns:
> The texts in question are primarily religious texts; science is secondary.... Courses that utilize these texts teach students that their conclusions must conform to the Bible, and that scientific material and methods are secondary. Students who [are] taught to discount the scientific process and the scientific conclusions validated by a wealth of scientific research are not being provided with an understanding of scientific principles expected by the UC faculty. (Wilbur Decl. No. 2 Ex. 2.)

15. Similarly, some Christian schools have declined to use BJU and A Beka textbooks because of concerns about the texts' academic merit. (Lynch Decl. No. 1 Exs. 47B ("[Valley Christian School] felt that the A Beka books ... did not represent the same level of academic rigor as we could find in some other texts."), 47C ("[Patten Academy declined to use A Beka and BJU textbooks] because they didn't provide the content that the principal and faculty believed would prepare the youngsters to meet their post-high school goals."); cf. Lynch Decl. No. 1 Ex. 47A ("[Oaks Christian School] acknowledge[s] that there was a much fuller treatment of evolution in the secular book that [it] used [than the BJU biology textbook, which it did not use].").)

16. Professor Kennedy, the editor-in-chief of *Science* magazine, teaches biology at Stanford University, where he once served as President of the University. (Kennedy Decl. Ex. A, at 4–5.)

17. Professor Ayala teaches biological sciences at University of California, Irvine. (Ayala Decl. Ex. A, at 4.)

Plaintiffs offer little admissible evidence to the contrary. Plaintiffs' Biology expert, Dr. Michael Behe, submitted a declaration concluding that the BJU text mentions standard scientific content. (Watters Decl. Ex. U.) However, Professor Behe "did not consider how much detail or depth" the texts gave to this standard content. (Watters Decl. Ex. U ¶ 4.) Therefore, Professor Behe fails to refute one of Professor Kennedy's primary concerns that the nature of science, the theory of evolution, and critical thinking are not taught adequately.

 Accordingly, there is no genuine issue of material fact as to this issue. Defendants had a rational basis for rejecting Calvary Baptist's proposed Biology course.

### 2. Free Exercise and Establishment Clauses

In their prior summary judgment motion, Plaintiffs argued that Defendants exhibited unconstitutional "hostility" toward religion, identifying 14 allegedly hostile acts that did not quite qualify as facial challenges.

Nine of these acts were allegedly unconstitutional symbolic burdens in violation of the Establishment Clause. In the Prior Order, this Court determined that these nine acts were not unconstitutional symbolic hostility under the Establishment Clause. (Prior Order 44–47.) That analysis still controls.[18]

The remaining five acts allegedly burdened Plaintiffs' religious practices in violation of the Free Exercise Clause. In the

Prior Order, this Court determined that two of these alleged acts were not supported by any evidence and that Plaintiffs failed to show that two other acts had burdensome consequences. (Prior Order 47–48.) That analysis still controls.

Accordingly, only one allegedly hostile act remains before the Court—"[UC] reviewers all wrote that religion courses taught by Cantwell/Sacred Heart of Mary should be rejected because they taught a single perspective." (Prior Order 48.) Because this allegedly burdensome hostile act must be analyzed under the Free Exercise Clause, Plaintiffs must show that Defendants had no rational basis for the course rejection or that Defendants rejected the course because of animus.

As mentioned above, Plaintiffs provide no evidence of animus similar to the facts in *Lukumi*. In addition, Plaintiffs provide no expert testimony that this course was irrationally rejected. Because Plaintiffs fail to raise a genuine issue of material fact, Defendants are entitled to summary judgment on this claim.[19]

### 3. Equal Protection Clause

As discussed in the Prior Order, claims based on religious discrimination that survive the *Lemon* test are subject to rational basis scrutiny under the Equal Protection Clause. (Prior Order 36–37 (citing *Locke v. Davey*, 540 U.S. 712, 720 n. 3, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004); *Johnson v. Robison*, 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974)).)

Because Defendants' course decisions survive rational basis scrutiny (*see* Part

18. Despite this analysis, the Court did not previously grant summary judgment in favor of Defendants on this issue solely because Defendants had not moved for summary judgment on these claims.

19. To the extent Plaintiffs claim that specific course rejections violate the Free Exercise

Clause or Establishment Clause, Plaintiffs provide no analysis in addition to its arguments under the Free Speech Clause. The Court's conclusion that the course rejections were rationally based and not motivated by animus defeats Plaintiffs' challenge under the Free Exercise Clause and Establishment Clause.

II.B.1.b of this Order), Defendants are entitled to summary judgment on Plaintiffs' as-applied equal protection claims.

### III. *RULING*

Because Plaintiffs fail to raise any genuine issue of material fact to support their as-applied claims, Defendants' Motion is GRANTED.

IT IS SO ORDERED.